FILED

2012 MAR -2  P 12: 39

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

1
2  NIALL P. McCARTHY (CA SBN 160175)
   nmccarthy@cpmlegal.com
   JUSTIN T. BERGER (SBN 250346)
3  jberger@cpmlegal.com
   ERIC BUESCHER (SBN 271323)
4  ebuescher@cpmlegal.com
   **COTCHETT, PITRE &**
5  **McCARTHY, LLP**
   San Francisco Airport Office Center
6  840 Malcolm Road
   Burlingame, California 94010
7  Telephone:    (650) 697-6000
   Facsimile:    (650) 692-3606

8  JEFFERY F. RYAN (CA SBN 129079)          MARK FRIEDLANDER, JR. (VA SBN 4773)
   jeff@jeffreyryanlaw.com                   mpfriedlander@verizon.net
9  **LAW OFFICES OF**                        **FRIEDLANDER, FRIEDLANDER &**
   **JEFFERY F. RYAN**                       **EARMAN, P.C.**
10 455 North Whisman Road, Suite 200         1364 Beverly Road, Suite 201
   Mountain View, California 94043           McLean, Virginia 22101
11 Telephone:    (650) 691-1430              Telephone:    (703) 893-9600
   Facsimile:    (650) 968-2685              Facsimile:    (703) 893-9650
12
13 *Attorneys for* Qui Tam *Plaintiff Dane Smith*

14              **IN THE UNITED STATES DISTRICT COURT**

15             **FOR THE EASTERN DISTRICT OF VIRGINIA**

16
   **UNITED STATES OF AMERICA** *ex rel.*    Case No. 1:10cv769 (JCC/JFA)
17 **DANE SMITH**, an individual,

18              Plaintiffs,                   **FIRST AMENDED COMPLAINT**

19     vs.                                    **DEMAND FOR JURY TRIAL**

20 **VMWARE, INC.**, a Delaware corporation;
   **CARAHSOFT TECHNOLOGY CORP.**, a
21 Maryland corporation;                       ┌─────────────────────────┐
                                               │   **FILED UNDER SEAL**    │
22              Defendants.                     │    **PURSUANT TO**        │
                                               │  **31 U.S.C. § 3730(b)(2)** │
23                                             └─────────────────────────┘

24

25

26

27

28

                                               **ORIGINAL**

⊕
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**FIRST AMENDED COMPLAINT;**  Case No. 1:10cv769 (JCC/JFA)

# TABLE OF CONTENTS

I.    **INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    **PARTIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    **JURISDICTION AND VENUE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.    **THE BASICS OF VIRTUALIZATION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.    **DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY FALSELY INFLATING THEIR GSA SCHEDULE PRICE**. . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.    The Federal Supply Schedule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.    Carahsoft's GSA Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     C.    Carahsoft's Sales of VMware Products Through the MAS. . . . . . . . . . . . . . . 9

     D.    The Disparity Between Commercial Pricing and Government Pricing. . . . . . . . 10

     E.    Use of "Consolidation Ratios" and Other Means to Further Inflate Prices to the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     F.    Defendants Overcharge the Government Further on Support and Subscription Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     G.    Additional Examples of Pricing Disparities. . . . . . . . . . . . . . . . . . . . . . . . . 15

     H.    VMware Set Up Carahsoft as a Sham to Attempt to Avoid False Claims Act Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII.    **DEFENDANTS KNEW THAT THEIR PRACTICES WERE ILLEGAL**. . . . . . . 18

VIII.    **THE COVER UP:  RETALIATION AGAINST RELATOR**. . . . . . . . . . . . . . . . 24

IX.    **CAUSES OF ACTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     FIRST CAUSE OF ACTION
     On Behalf of the United States
     **Federal False Claims Act, Presenting False Claims**
     **31 U.S.C. § 3729(a)(1)(A)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     SECOND CAUSE OF ACTION
     On Behalf of the United States
     **Federal False Claims Act, Making or Using False Records or Statements**
     **Material to Payment or Approval of False Claims**
     **31 U.S.C. § 3729(a)(1)(B)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     THIRD CAUSE OF ACTION
     **On Behalf of the United States**
     **Federal False Claims Act, Conspiracy to Commit Violations**
     **31 U.S.C. § 3729(a)(1)(C)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

FOURTH CAUSE OF ACTION
(In the Alternative)
On Behalf of the United States
**Federal False Claims Act, Retention of Proceeds to Which Not Entitled**
31 U.S.C. § 3729(a)(1)(G).................................................. 31

FIFTH CAUSE OF ACTION
On Behalf of Relator
**Federal False Claims Act, Retaliation**
31 U.S.C. § 3730(h)....................................................... 31

SIXTH CAUSE OF ACTION
On Behalf of Relator
**Wrongful Termination in Violation of Public Policy**.......................... 32

**X.      PRAYER FOR RELIEF**.................................................. 33

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

On behalf of Plaintiff UNITED STATES OF AMERICA, and on his own behalf, Plaintiff and Relator DANE SMITH alleges as follows:

I. **INTRODUCTION**

1. This action alleges that, since at least 2000, Defendants have knowingly defrauded, and continue to defraud the United States by not providing government purchasers with comparable pricing, discounts, and sale terms as those received by Defendants' commercial customers, in violation of law. As such, VMware, Inc. ("VMware") and Carahsoft Technology Corp. ("Carahsoft") (collectively "Defendants") have knowingly submitted false claims, made false statements, and conspired to defraud the federal government.

2. Among other things, Defendants have defrauded the government by furnishing the General Services Administration ("GSA") with inaccurate pricing, inaccurate disclosures, and incomplete information about the sales of VMware software, licenses, and related maintenance, professional, and educational services. As a result of Defendants' knowing submission of false pricing information, the government has paid higher prices on VMware products and services than it should have paid.

3. Defendants' knowing submission of false and fraudulent claims for payment constitutes a violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"). As a result of their fraudulent conduct, Defendants have caused the United States to sustain a direct loss of funds and damage to its interests.

4. Defendants made false claims to Plaintiff United States for payment for products and services by misrepresenting the amounts that Defendants charged other customers for the same products and services, and by over-representing to Plaintiff United States the quantity of Defendants' products and services that Plaintiff needed.

5. Defendants concealed the fact that they did not have a right to those payments by means of the false claims and representations described in this Complaint.

6. VMware is the market leader in "virtualization" software technology. Virtualization software allows for the consolidation of multiple physical computers and servers into one. For example, a company with 100 physical servers, after purchasing VMware's virtualization products, will be able to perform the same amount of computing function with only

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1   10 physical servers. The technology thus allows companies to cut down on hardware costs,
2   energy costs, and space dedicated to physical servers.

3       7.     The technology is also useful to the government and its agencies, whose use of,
4   and need for, robust computing systems are comparable to the biggest private companies in the
5   world. In selling to the government, however, VMware and Carahsoft have systematically
6   charged more than they charge comparable commercial customers for the very same products and
7   services.

8       8.     Defendants have done so by violating express federal laws, regulations, and
9   contractual terms that are designed to ensure that the government receives the best prices
10  available.

11      9.     Defendants actively concealed the acts alleged herein from the government.
12  Defendants never informed the government of the discounted prices they charged their other
13  customers, and never informed the government that their prices on the GSA schedule were
14  falsely inflated.

15      10.    This is precisely the type of conduct the False Claims Act is designed to combat.
16  The FCA was originally enacted at the request of President Lincoln during the Civil War. The
17  president believed that the Union Army was being defrauded by unscrupulous contractors. The
18  Act was substantially amended by Congress in 1986 and 2009 to enhance the government's
19  ability to recover losses sustained as a result of defendants' fraud. At those times, Congress
20  determined that fraud against the government was pervasive and that the FCA, which Congress
21  described as the primary tool for combating government fraud, was in need of strengthening.
22  Congress intended that the amendments create incentives for individuals with knowledge of
23  fraud against the United States to disclose the information without fear of reprisals or
24  government inaction, and to encourage the private bar to commit legal resources to prosecute
25  fraud on the government's behalf.

26      11.    Any person who violates the FCA is liable for a civil penalty of up to $11,000 for
27  each violation, plus three times the loss sustained by the United States. 31 U.S.C. § 3729(a); 64
28  Fed. Reg. 47099, 47103 (1999).

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

1    12.    Based on the FCA, *qui tam* Plaintiff Dane Smith ("Smith" or "Relator") seeks to

2  recover treble damages, civil penalties, attorneys' fees and costs, and other relief for the federal

3  violations alleged herein, including retaliation in violation of the federal False Claims Act, 31

4  U.S.C. § 3730(h).

5    13.    Defendant VMware also committed violations of state law, including wrongful

6  termination in violation of public policy. Smith seeks to recover all available damages, penalties,

7  and other relief for the state violations alleged herein.

8  **II.    PARTIES**

9    14.    The Plaintiffs in this action are the UNITED STATES OF AMERICA, through

10  Plaintiff and Relator DANE SMITH, who also brings claims on his own behalf.

11    15.    Relator and Plaintiff DANE SMITH ("SMITH") is a former employee of

12  defendant VMware.

13    16.    Defendant VMWARE, INC. ("VMware") (NYSE: VMW) is a Delaware

14  corporation with its principal place of business at 3401 Hillview Ave., Palo Alto, California. At

15  all times relevant hereto, VMware conducted business in the Eastern District of Virginia.

16    17.    Defendant CARAHSOFT TECHNOLOGY CORP. ("Carahsoft") is a privately

17  held Maryland corporation that distributes products, including those of VMware, to local, state,

18  and federal governments. It provides these products to the federal government through its

19  contract, GS-35F-0131R, with the GSA. Carahsoft's principal place of business is located at

20  12369 Sunrise Valley Drive, Suite D2, Reston, Virginia.

21  **III.    JURISDICTION AND VENUE**

22    18.    This Court has jurisdiction over the subject matter of this action pursuant to 28

23  U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this

24  Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

25    19.    Personal jurisdiction and venue are proper in this district pursuant to 28 U.S.C. §§

26  1391(b) and 1395(a), and 31 U.S.C. § 3732(a), as one or more of the Defendants or their agents

27  can be found, reside, transact business, or otherwise engaged in fraudulent conduct within the

28  district.

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1 | **IV.**     **THE BASICS OF VIRTUALIZATION**

2     20.     VMware is the market leader in – and in fact has a near-monopoly on –

3 "virtualization" software technology. Virtualization software allows for the consolidation of

4 multiple physical computers and servers into one. For example, a company with 100 physical

5 servers, after purchasing VMware's virtualization products, will be able to perform the same

6 amount of computing function with only 10 physical servers. The technology thus allows

7 companies to cut down on hardware costs, energy costs, and space dedicated to physical servers.

8     21.     The following pictures show a server room before use of VMware's virtualization

9 software, and after:



28 | / / /

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

22.    VMware's virtualization technology is based on the fact that the vast majority of computer hardware is underutilized.  For example, a typical desktop computer or server, at any given moment, will typically only be utilizing 10% or less of its Central Processing Unit's (CPU's) capacity.  Virtualization allows multiple "virtual machines" to run on one CPU, thereby maximizing use of the CPU, and making the entire system more efficient.  The virtualization technology consists of a layer of software that slides between the operating system and the hardware, allowing one physical machine to act as several machines, each with their own operating system and applications, as illustrated here:

///

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

23.     CPU efficiency can thus be increased from this:



To this:

/ / /

24.     As the world rapidly increases its need for computing capacity, VMware's virtualization technology has become indispensable to entities of all sizes. As a result, VMware has grown into the fourth most valuable software company in the world. According to its most recent Form 10-K filed with the SEC, VMware had total revenues in 2010 of over **$2.8 billion**, and has reported total revenues for 2011 of over **$3.77 billion**. VMware's growth has been explosive, having had only $700 million in revenues in 2006.

25.     Much of this growth is due to VMware's sales to the federal government. As stated in a 2009 VMware press release:

> "**Our solid third quarter results were driven by strength in the US Federal sector**, increased transaction volumes and particularly robust growth in our maintenance renewals," said Mark Peek, chief financial officer.

26.     In 2011, VMware's CEO, Paul Maritz, emphasized how deeply VMware had penetrated the federal government, stating:

> VMware is deployed throughout the Executive, Legislative, and Judicial branches of the U.S. Federal Government, including the Department of Defense and all branches of military and joint commands, all Cabinet-level agencies, and many quasi-governmental agencies and NGOs. The VMware vision for cloud computing in the federal government focuses on enabling agencies to adopt cloud while preserving existing investments. With virtualization as the foundation, agencies can build cloud architectures that are flexible enough to support a unified private and hybrid cloud model.

## IV. DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY FALSELY INFLATING THEIR GSA SCHEDULE PRICE

### A. The Federal Supply Schedule

27.     A plurality of VMware's sales to the federal government are through the General Services Administration's ("GSA") "Federal Supply Schedule" ("FSS"), or "Multiple Award Schedule" ("MAS"). Federal agencies can utilize the MAS to buy goods and services at a fixed price. The MAS is created from hundreds of pre-negotiated contracts. Procurement managers from government agencies can view these agreements and make purchases from the schedule, knowing that the contract terms and legal provisions have already been negotiated on their behalf.

28.     In order to participate in the MAS program, vendors must agree to disclose their "commercial sales practices" ("CSP"), which include: (1) past commercial and government sales data, (2) discounts and concessions offered to their most favored customers, and (3) current published commercial catalogs and/or price lists from which such discounts are offered. GSA also requires vendors to disclose if they deviate from their standard written pricing policies, and to include a discussion of the frequency and nature of those deviations. In addition, GSA requires that vendors provide pricing information that is current, accurate, and complete. 48 C.F.R. § 515.408, 48 C.F.R. § 552.212 70.

29.     GSA contracting officers determine whether the potential vendor's prices are fair and reasonable by comparing the prices and discounts that a company offers the government with the prices and discounts that the company offers to its commercial customers, as reported by the company. GSA attempts to obtain "Most Favored Customer" status for individual government purchasers, which means it seeks to obtain prices comparable to a vendor's best price to its most favored customers making similar purchases. 48 C.F.R. § 538.270.

30.     When the vendor does not have commercial sales to the general public, it must provide to GSA the manufacturer's sales data if the manufacturer's sales under any resulting contract are expected to exceed $500,000. The vendor must also obtain written authorization from the manufacturer for government access to the manufacturer's sales records for the purpose of verifying the sales data submitted by the manufacturer. *See* 48 C.F.R. § 515.408(b)(5).

31.     Another contract provision designed to protect the government is the "price reductions clause" ("PRC"), which ensures that initially awarded prices remain fair and reasonable throughout the life of the contract.  Under the PRC, the contracting officer and the vendor agree, before the contract is awarded, on:  (1) the customer (or category of customers) that will be the basis of the award (called the "tracking customer"), and (2) the government's price or discount relationship to the tracking customer (or category of customers).  This relationship is maintained throughout the contract period.  If the contractor reduces the tracking customer's price at any time during the contract period, the government also receives the benefit of any such reduction.  48 C.F.R. § 552.238-75(a), (c).

32.     VMware has sold its products to federal agencies through the MAS program for several years.  Various entities have entered into MAS contracts through which VMware products have been sold, and the allegations set forth herein apply to those entities.

**B.     Carahsoft's GSA Contract**

33.     Currently, Carahsoft holds a GSA contract, number GS-35F-0131R, for sales of general purpose commercial information technology equipment, software, and services.  The period covered by the contract is November 19, 2004, through  May 7, 2012.

34.     In January 2007, VMware products were added to Carasoft's GSA contract.  As such, Carahsoft became the exclusive seller for VMware products to the federal government.

35.     During the fourth quarter of 2007 alone, VMware had approximately 10,000 sales transactions totaling $264 million.  Of this amount, about 680 transactions, totaling $27 million, were sales to the federal government through the Carahsoft GSA contract.

**C.     Carahsoft's Sales of VMware Products Through the MAS**

36.     VMware and Carahsoft knowingly violated the GSA regulations by failing to provide the federal government with accurate and complete pricing information for their commercial and government sales, and by failing to report subsequent price reductions and discounts offered to commercial customers.  As a result, the federal GSA schedule contains falsely inflated prices for VMware's products (sold through Carahsoft, as described below).

37.     As a result, all of Defendants' sales to the federal government through the MAS are based on fundamentally false information, and all claims for payment under those sales therefore constitute false claims.

**D.     The Disparity Between Commercial Pricing and Government Pricing**

38.     VMware's pricing structure is heavily discount-based.  VMware maintains a standard list price, which is decreased based on multiple discount programs.

39.     The list price for VMware's products is generally the same for commercial customers and government customers.  The discounts provided, however, vary wildly, with commercial customers receiving far more discounts.

40.     Based on the incomplete and inaccurate pricing data provided by VMware to the federal GSA, Defendants' listing in the federal GSA schedule provides for a 12% discount off of VMware's main product.

41.     This 12% discount does not even approach VMware's most favorable discount to commercial customers.  Indeed, the 12% discount is far less than VMware's average or median discount to commercial customers, and there are few, if any, commercial customers who do not receive a more favorable discount.

42.     Over the past several years, VMware has added multiple standard discount programs for commercial customers.  VMware has also added a few limited, discretionary discount programs for federal customers on top of the 12%.  Nonetheless, the disparity between VMware's standard discounts for commercial customers, and federal customers, remains staggering.  The following chart illustrates the disparity between VMware's standard discount programs:

/ / /

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP



43. There was never any legitimate justification for this discrepancy. Indeed, VMware offered governments outside of the United States **better** discounts than were offered to commercial customers.

44. In addition to VMware's standard discount programs, VMware often negotiates *ad hoc* discounts for commercial customers in the form of contracts called Enterprise License Agreements ("ELAs"). ELAs typically provide discounts even greater than are available through VMware's standard discount programs.

45. VMware also arranges some commercial deals through "Special Pricing Forms" (SPFs), which provide additional *ad hoc* discounts on top of VMware's standard discounts.

46. VMware did not report ELA or SPF pricing to the federal GSA, nor has VMware updated the GSA with the commercial discount programs that it has rolled out since the GSA price was set. Accordingly, the GSA schedule, which was initially based on false information, has grown even more fraudulent, and fails to provide the government with the best discounts available.

47.     As a result, all of Defendants' sales to the federal government through the GSA schedule are based on fundamentally false information, and all claims for payment under those sales therefore constitute false claims.

48.     Additionally, the false information contained on the GSA schedule materially impacted Defendants' sales to the federal government that did not go directly through the GSA process.  For example, on information and belief, the GSA schedule price is the starting point, or otherwise materially impacts, the negotiation of prices on government contracts that are greater than $500,000, and therefore do not go directly through the GSA procurement process. Accordingly, the false information upon which the GSA schedule is based materially impacts and infects all such negotiations and resulting contracts, and any claims for payment under those contracts constitute false claims.

49.     Furthermore, on information and belief, many non-GSA contracts between Defendants and the Government contain provisions that require Defendants to provide the Government with the best prices made available to commercial customers for the same products. Defendants knowingly violated such contractual requirements by systematically charging the Government more than their other customers.

E.      **Use of "Consolidation Ratios" and Other Means to Further Inflate Prices to the Government**

50.     In addition to charging the Government more per license of VMware's virtualization software than they should have, Defendants overcharged the Government in a second way:  intentionally over-representing the number of units that government customers needed to buy.

51.     For example, for a commercial customer needing to virtualize 100 physical servers, VMware might advise the customer that those 100 physical machines can be consolidated through virtualization onto only 10 physical servers.  Hence the customer will only need to purchase 10 licenses.  The number of physical machines that can be consolidated onto one machine is referred to by VMware as the "consolidation ratio."  In this example, the consolidation ratio would be 10:1.

52. VMware's internally published acceptable consolidation ratio standard is between 4:1 and 6:1. Any ratio higher than that was to be substantiated in writing and spelled out in detail in the ELA Template Worksheet circulated internally for approvals. Ranges above 6:1 were intended to be permitted only under the most exceptional circumstances. However, consolidation ratios far in excess of 6:1 for commercial customers were commonplace and there was no enforcement of internal policy requiring detailed rationale or explanations for the exceptionally high discounting for commercial customers.

53. For a government customer, however, with the same number of physical servers, and the same basic computing needs, VMware will advise a lower consolidation ratio, such as 4:1. With a 4:1 consolidation ratio, the government would have to buy 25 licenses, rather than just 10. Moreover, the government would still be left with 25 physical servers, and all of the energy, hardware, and support costs associated therewith.

54. Due to VMware's dominance of the market for virtualization software, most government purchasers lack the negotiating leverage, and the knowledge, to challenge VMware's assertion of the appropriate consolidation ratio.

55. VMware thus essentially disguises additional discounts to its commercial customers, and sells the government more licenses than it wants or needs, by misrepresenting the appropriate consolidation ratios for government purchasers. This occurs in many contracts with the Government – not just those that are established through the MAS.

56. However, the impact is compounded in the MAS program, because Defendants fail to report the discrepancies in consolidation ratios to the federal GSA. The GSA schedule price is therefore higher than it would be otherwise.

57. Consequently, Defendants' charges to the Government for VMware licenses and attendant services violate the False Claims Act.

58. Defendants' upper-level management, executives, and directors were well aware of the discrepancies between consolidation ratios provided to commercial customers and those provided to the government. Among those to whom these discrepancies were reported were VMware's Vice President of Audit and Compliance, Susan Insley, the Audit Committee of the

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

Board of Directors (including Michael Browne, Dennis Powell and Renee James), and CEO Paul Maritz.

59.     VMware management knew that the manipulation of consolidation ratios was potentially problematic, but believed that if the terms of commercial ELAs remained hidden, the manipulation would not be caught.  Accordingly, VMware Senior Management often referred to ELA commercial pricing as "black box" ELA pricing.  For example, VMware entered into an ELA with the UK Ministry of Defense that was far more favorable than a larger ELA entered into with the United States Navy Marine Corps Internet (NMCI) during the same time period.  Jeff Littlejohn, then the Director of Systems Integrators and Outsourcing for VMware, expressed to Aileen Black and Carl Eschenbach his concern that the more-favorable terms of the UK deal would come to light.  Littlejohn sought reassurance that the consolidation ratios and other key components of the UK ELA were hidden via the "black box ELA price" model.  Eschenbach responded by confirming that: "On ELA's we do not disclose discounting, it's a black box pricing model."

60.     Even worse than the consolidation ratio disparity, VMware offers many of its commercial customers contracts that allow for the <u>unlimited</u> addition of licenses during the term of the contract, at no extra cost.

61.     For example, in September of 2007, VMware offered eBay a contract for 1,000 licenses, at a discount of 53% off the list price.  The 1,000 license figure was based on a recommended consolidation ratio of 8:1.  In addition, VMware allowed eBay to add an unlimited number of additional licenses to the contract, at no further charge, for the two-year term of the contract.

62.     The terms of this eBay deal are of the type offered by Defendants' to their most favored commercial customers.  The federal government should have received comparable terms, but did not.

F.     <u>Defendants Overcharge the Government Further on Support and</u>
        <u>Subscription Services</u>

63.     Much of Defendants' revenues come in the form of "Support and Subscription" ("SnS") charges.  All buyers of VMware's software must purchase SnS packages along with the

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

software.  Among other things, SnS services provide support, software upgrades, and software patches.  The SnS packages vary in their term (usually one to three years) and in the level of support (e.g., 12 hours per day phone support versus 24 hours a day phone support).

64.     Generally, the price for SnS services for commercial customers is set as a percentage of the net price of the software purchased (the list price less the discounts).  Thus, for example, a commercial customer will be offered SnS for 20% of the net price of all of the software purchased.  If the customer pays $10,000 for software (discounted from a list price of $20,000), the customer will pay an additional $2,000 per year for SnS.

65.     Government customers, however, will typically be offered SnS based on a percentage of the **list** price of the software purchased.  Thus, if a government customer pays $15,000 for software (discounted from a list price of $20,000), Defendants will charge the government customer 20% of the $20,000 list price for SnS:  $4,000 per year.

66.     SnS thus compounds the disparity between the discounts Defendants offer commercial customers and the discounts Defendants offer the government.  Moreover, as with the software prices, SnS prices are listed on Defendants' federal GSA schedule, at an inflated price based on false and incomplete information.

**G.     Additional Examples of Pricing Disparities**

67.     A typical commercial purchase is illustrated by Defendants' sale to Commercial Customer A ("Customer A") on December 28, 2007.  The sale was for 794 VI3 licenses.  The contract used a consolidation ratio of 7 to 1, offered a discount of 56% (actually 56.1828%) off the list price of the licenses, and priced the SnS services at 18% of the net price of the software for the 3-year term of the contract.

68.     Defendants also provided Customer A with an ELA that allowed an unlimited number of licenses to be obtained for free, meaning that it could legally download an infinite number of VI3 licenses and an infinite amount of SnS services on those licenses within the next 3 years at no additional cost.  The unlimited ELA provision was valuable to Customer A because it had 8,000 servers with 16,000 CPUs and thus was likely to need additional licenses.

69.     For this sale, the average cost of each of the original 794 VI3 licenses was $2,519.50 ($5,750 list price x 794 licenses = $4,565,500; $4,565,500 - [$4,565,500 x .561828

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

1    discount] = $2,000,474; $2,000,474 / 794 licenses = $2,519.50). The SnS services for 3 years

2    totaled $1,092,087.

3        70.     A typical federal purchase comparable to the above commercial sale is illustrated

4    by Carahsoft's sale to the United States Central Command ("CENTCOM") on January 24, 2008.

5    The sale was for 460 VI3 licenses. This sale used a consolidation ratio of 4 to 1, a discount of

6    only 39% on the licenses, and pricing at 21% of net on the SnS services for the 3-year term. In

7    addition, the ELA was capped at 460 licenses. Thus, if CENTCOM wanted additional licenses,

8    it would need to make another purchase, incurring additional costs for the licenses and additional

9    costs for the SnS services on those licenses.

10       71.     The average cost of each VI3 license on this federal sale was $3,507.50 ($5,750

11    list price x 460 licenses = $2,645,000; $2,645,000 - [$2,645,000 x .39 discount] = $1,613,450;

12    $1,613,450 / 460 licenses = $3,507.50). Thus, federal purchaser CENTCOM paid 38% more on

13    a per VI3 license basis than did commercial Customer A above.

14       72.     In summary, the comparable characteristics of the two sales were:

|  | Customer A | CENTCOM |
|---|---|---|
| Number of VI3 Licenses | 794 | 460 |
| Consolidation Ratio Used | 7 to 1 | 4 to 1 |
| Discount on VI3 Licenses | 56% | 39% |
| Discount on SnS Services | 18% | 21% |
| Average Cost of VI3 License | $2,547.50 | $3,507.50 |
| ELAs | Unlimited number | Limited to 460 |

22       73.     In addition to CENTCOM paying 38% more per VI3 license, CENTCOM's future

23    SnS costs after the third year would be $569,381 per year for only a maximum of 460 licenses.

24    By comparison, Customer A's future SnS costs each year after the third year would be $598,520

25    for *as many licenses* as it had wanted to download during the 3 previous years. Of particular

26    significance in the federal sale is that CENTCOM's ELA was capped at 460 licenses. Thus, the

27    risk to VMware that CENTCOM would download additional VI3 licenses was not as great as

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1 | that of Customer A, since CENTCOM only had 600 servers and 1,500 CPUs, compared to

2 | Customer A's 8,000 servers and 16,000 CPUs.

3 |      74.    If the lower 4 to 1 consolidation ratio -- the ratio provided to the government --

4 | had been given to Customer A, this commercial customer would have had to purchase 1,389

5 | licenses at an additional cost of $3,421,250, or 75% higher than it actually did.

6 |      75.    A table listing additional sales that demonstrate the difference in Defendants'

7 | charges to commercial customers and federal agencies is attached hereto as Exhibit A.

8 |      **H.**    **VMware Set Up Carahsoft as a Sham to Attempt to Avoid False Claims Act**

9 |           **Liability**

10 |      76.    VMware was aware that it faced false claims act liability for failing to provide

11 | federal and state governments with the same prices and discounts that it offered commercial

12 | customers. Accordingly, in January 2007, in a misguided attempt to shield itself from liability,

13 | rather than list itself on the federal GSA schedule, it made a separate company, Carahsoft, the

14 | sole GSA schedule holder for VMware's products.

15 |      77.    This scheme is evidenced in e-mails written by Aileen Black, the head of

16 | VMware's federal sales division (referred to as the "federal channel"). For example, in her

17 | weekly report dated November 17, 2006, Black wrote: "Carahsoft plan moving but need to keep

18 | on track for Jan 1. We have got to move on the [Carahsoft] GSA business plan. ORACLE had

19 | huge fine this week due to not handling this properly (I might add this is the second time!!). If

20 | we set this up now correctly we will avoid difficult issues for the future."

21 |      78.    Similarly, in an e-mail dated January 23, 2007, from Aileen Black to CEO Diane

22 | Greene and other upper-management, Black officially announced the Carahsoft arrangement, and

23 | incorrectly stated that it "provides VMware with some added protection from the legal issues

24 | regarding best pricing practices to the government." VMware and Black mistakenly believed

25 | that if they did not have a direct contract with GSA, they would not be caught overcharging the

26 | federal government.

27 |      79.    Carahsoft was thus nothing but a sham to attempt to shield VMware from liability

28 | for its knowing violations of pricing rules. VMware of course maintains tight control over

Carahsoft and its practices. Carahsoft performs marketing functions controlled directly by

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

VMware, and unlike a truly independent reseller, all deals made by Carahsoft with the government must be approved by VMware.

80.     As a result of this relationship, Carahsoft has quickly grown to be one of the top 100 government technology contractors in the United States. Carahsoft's revenues jumped from merely $91.9 million in 2006, to $834.5 million in 2010, and over **$1 billion in 2011**.

81.     Defendants also attempted to shield themselves from liability and justify the vast pricing disparity between commercial and government by falsely claiming that the software sold to the government was different than the software sold to commercial customers. It was and is not; the software is exactly the same. Defendants attempted to concoct a differentiation by labeling software sold to the government with a different SKU number – referred to as "Government SKUs". As discussed in the interview responses below, however, there was absolutely no difference between software products that carried Government SKU numbers, and the products sold commercially under standard SKUs. In fact, during much of the time that Defendants claimed to the government to have unique products with Government SKUs, internally Defendants had not even set up a separate Government SKU product line. The existence and legitimacy of Government SKUs was another false and fraudulent claim made by Defendants to the federal Government, for both GSA and non-GSA sales.

## VII.     DEFENDANTS KNEW THAT THEIR PRACTICES WERE ILLEGAL

82.     Defendants knew that the foregoing practices were illegal, as evidenced in multiple internal documents in Relator's possession.

83.     For example, in an e-mail from the head of VMware's federal sales, Aileen Black, to VMware's then-CEO Diane Greene, dated May 27, 2008, Black pitched a new proposed discretionary discount program for federal customers, and plainly informed Greene of the discrepancy between government discounts and commercial discounts, stating: **"BTW the max discount on this program is much less than the non-federal program (46% vs 67%)."**

84.     Black attached to the e-mail an executive summary of the proposed discount program. In that executive summary, provided to then-CEO Diane Greene, Black plainly acknowledged the effect of the disparity between available discount programs, stating: **"Federal margins have been significantly higher than commercial margins in the US . . ."**

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

85.     In the executive summary, Black also emphasized that a goal of her proposed new discount structure was to "**[c]onvert automatic Government discounts into discretionary discounts . . .**" In that way, Black could further limit and control the amount of discounts provided to government customers.

86.     Concerned that Black's new program perpetuated unlawful discrepancies between commercial and government discounts, two VMware employees, Leigh Madden and Steven Houck, put a hold on Aileen Black's proposed new program in order to conduct an internal investigation into VMware's federal pricing practices. In response, Aileen Black, and her superior, Carl Eschenbach, expressed great frustration at the delay, and inquired about the reasons for the investigation. Houck's response was as follows:

> **As we were putting the program together Leigh and partners were raising concerns about the ethics and legality of our pricing practices in Federal. The team was meeting with disti prior to launch this past [week] and more serious concerns were raised. I checked with Leigh again and he expressed concern with us pricing our government deals at a higher price than what is Commercially available. This coming to a head on a current deal with EPA and Dell. I am being told that Aileen is strong arming pricing that violates GSA requirements. I have not verified this.**
>
> **Short of it. I don't want to put me You or VMware at financial or legal risk through the program.**

87.     A follow-up e-mail string from the same evening reiterated the same concerns regarding the discrepancy between federal and commercial pricing. In that string, Houck wrote: "**My concern is that we are institutionalizing a pricing practice that could be off sides.**" At the time of these e-mails, Carl Eschenbach was the Executive Vice President of World Wide Field Operations at VMware.

88.     In another e-mail from the same period, Madden wrote Houck as follows:

> The original Federal program was based on pricing to our distributors at the same discount levels (20% or 25% depending on VIP tier) as the commercial program. There was concern amongst the VMware Finance team that this discount level would negatively impact our margins and the maximum distribution discount level approved by VMware Finance was 15%. The 12% or 15% distribution discount for the Federal program will put any partner using this pricing at an 8-10% disadvantage to any similar partner quoting commercial pricing . . . . **Our higher pricing to the US Government is not the industry norm and regularly results in questions from our partners as to why we charge the Government more than commercial customers. . . .**

> **We are required to disclose pricing differences between Federal and commercial pricing in our commercial sales practices chart which Carahsoft must submit to GSA as a part of their letter of supply submission.**

(Emphasis added.)

89.     As part of Madden and Houck's investigation, they conducted a series of interviews with VMware employees and resellers. The interviewees' responses reflect widespread knowledge and concern regarding the discrepancies between commercial and government prices.  For example, Question 4 asked: "Do you have any concerns about VMware's current partner programs or pricing practices?"  Among the responses were the following:

- Yes. . . . VMW positioning high pricing to Fed customer and partner knows we provide better pricing to commercial.  Counter to what is expected.

- . . . . The disparity between our Fed and Commercial programs creates a risk for VMware.  Immix key tenet - Fed and commercial programs should look alike to minimize risk.

- I like seeing a program being prepared to develop standard practices.  Advice - if Fed discount standards are different from commercial, need to justify w/ GSA. . . .

90.     Question 5 of the survey asked: "Were you made aware of the differences between our VMW Govt product vs. our commercial product and the additional warranties/benefits associated with the VMW Govt product?"  The responses were as follows:

- No.

- No. **There is really no difference. Smoke and mirrors.** Different SKUs helped us w/ GSA and to eventually have tracking of Gov't business.  It has never been clear.  No write-up that I am aware of.  Should include warranties in the EULA.  All VIP agreements must specify use of appropriate SKU.

- No. Partners don't perceive any difference.  They look at the comm. vs. Fed delta and quote commercial pricing open market.

- No.

- No

- Yes.  It was explained one year ago.  Customers are not aware.  HP has different SKU structure for Federal - common criteria etc.

---

**FIRST AMENDED COMPLAINT;**  Case No. 1:10cv769 (JCC/JFA)                          20

1 • No

2 • No

3     91.    Question 8 asked: "Is there anything else you would like to address regarding

4 VMware or the VMware Federal partner program?" Among the answers were the following:

5           •    To remove ambiguity - have GSA come in to review program
before we launch it. Ensure collaboration w/ GSA. **Parity**

6             **between commercial and Fed programs. Must justify any
deltas.**

7

8           •    **Pricing to Fed Govt is higher than commercial - I am aware of
this perception. . . . We are seeing most vendors w/**

9             **Commercial/Fed pricing parity. . . .**

10     92.    In a power point document summarizing the results of the interviews, several

11 suggestions were made to alter VMware's federal pricing practices. Among those were to:

12 "Remove commercial pricing advantage to create incentive for partners to use program pricing,"

13 and "Address concerns about pricing inequity to Gov't."

14     93.    The results of the investigation and interviews were shared with upper

15 management at VMware, all of whom knew of the GSA most favored customer requirements.

16 For example, in the executive summary Aileen Black provided to then-CEO Diane Greene on

17 May 27, 2008, discussed above, Black wrote that one of the "Program Objectives" was to

18 "[m]aintain compliance with Government [*sic*] Services Administration (GSA) commercial

19 practices comparison requirements." (This, of course, was a purely self-serving, false statement

20 – management and executives knew that neither the original nor proposed discount programs

21 complied with GSA requirements.)

22     94.    Because of the vast discrepancy in discount programs between commercial and

23 federal, independent VMware resellers sometimes quoted the better commercial discounts to

24 federal government customers. Doing so put Defendants at risk; they did not want federal

25 government customers knowing about the much-greater discounts available to commercial

26 customers. Accordingly, VMware management responded aggressively when resellers quoted

27 commercial discounts to federal customers. For example, in or about April 2006, Defendants

28 rolled out a "VPP" discount program. Aileen Black vehemently prohibited application of the

VPP discounts to government sales, despite internal opposition, including from Relator Smith.

1  In an e-mail to Relator Smith, dated July 13, 2006, Black stated: "Fyi due to several issues

2  including legal. This program will not be rolled out to FED."

3      95.    In March 2007, enhancements were made to the VPP discount program which

4  increased the discounts in the first three bands by an additional 5% and lowered the management

5  approval levels. However, the discounts were still not permitted to be used in sales to the

6  government.

7      96.    Just a month later, in April 2007, the commercial channel launched a new

8  discount program called "Advantage+" which provided discounts not related to volume of

9  purchases. It increased a prior discount of 6% to a potential discount of 19%, representing a 10%

10  base discount, an additional 6% rebate for selling to a new VMware customer, and an additional

11  3% when the sale involved the new "Solution Track" methodology. Elliot Fliesler, VMware's

12  Senior Channel Demand Program Manager, sought to obtain Smith's signature on the

13  Advantage+ program guide on April 4, 2007. In response to Fliesler's email to Smith and Black,

14  Black sent an email to Smith on April 5, 2007, stating:

15          These need to clearly state that these are not applicable to the Government
            sales direct or indirect. We already offer rebates in our program. You
16          need to alter this before it goes out. Ed [Edward Gibson, Inside Sales Rep
            and later Federal Channel Sales Manager] can you make the suggested
17          changes and send back to Dane. This is extremely
            important!!!!!!!!!!!!!!!!!!!!

18  Smith replied to Black the next day with "cc's" to Jennifer Baker ("Baker"), formerly employed

19  by VMware as Channels Sales Manager, and Edward Gibson that: "First I heard that this should

20  not count. I do not agree." As a result, Baker emailed to Smith that same day:

21          Colleen (and Brandon and Alan) [Colleen Lenihan, Director of Channel
22          Development, Brandon Sweeney, Director of Americas Channel Sales, and
            Alan Geary] are very aware that this new program can't be used for Fed
23          customers .... When we first developed the Government Opp Reg program,
            we were unaware that this new program was being developed .... I think
24          it's a huge disadvantage for Fed that the programs are different and that
            the new program is better than ours.

25      97.    Black continued to remind VMware management that the federal channel did not

26  have the same volume discounts and prices as the commercial channel. She sent Amaury

27  Gallisa, formerly employed by MVware as Vice President of World Wide Channels, an email

28  regarding the VPP on June 25, 2007, stating:

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

> Again, I have pointed this out time and time again. Do these documents note that this [does] not apply to the government? I don't want to be chapter 2 in the investigation under EMC's situation. WE still haven't gotten any response on the TPP program [the government's volume pilot plan that was rolled out in July 2007]. I am more than just [a] little frustrated and without being clear on this issue we are putting the company at risk.

98. Black continued to be upset that VMware resellers were quoting government buyers with the commercial discounts, and worried that by doing so, it would become clear to the Government that it was not receiving the same prices offered to commercial customers. In her Weekly Report - Public Sector ("Report") to Smith and his management team on August 11, 2007, she stated:

> VPP continued to be "accidently" used with government accounts. This is a serious issue. TPP promo rolled out to help but still has continued. GSA is spending more time finding companies to fine (just ask SUN, EMC, and Oracle) than working on their day job. It is very profitable when you fine folks 100 million. This is serious. The times have changed and they are cracking down and cracking down hard.

99. In March 2008, sales representatives from AltTech, one of VMware's authorized resellers, sought to sell VMware products to the United States Department of Agriculture ("USDA") utilizing the Carahsoft GSA contract. AltTech had provided pricing information to USDA based upon the standard commercial discounts it had previously used in its commercial sales. However, VMware's federal channel prohibited AltTech from offering the standard commercial discounts to the USDA. Leigh Madden ("Madden"), VMware's Director, Public Sector Partner Sales, sent an email, dated March 13, 2008, to Brian Johnson and John Stubbs of AltTech stating:

> There appears to be some confusion on your end. Reviewing our conversation yesterday:
> 1. I stated that Federal transactions were not eligible for commercial pricing/programs. This is clearly stated in VMware partner central and on the opportunity registration page. Currently we have only one dealer approved for Federal business - Carahsoft. We mistakenly accepted the S1 - USDA registration with AltTech manually added to the preferred distributor box, so we agreed to provide an AltTech discount of 25% for an Enterprise VAR plus an additional 6% for this transaction only. There was no discussion of any further discount or rebate nor applicability to any other deal.

/ / /

100. In a subsequent email to Brian Johnson and John Stubbs on March 20, 2008, Madden stated:

> I want to follow up to our recent conversation regarding USDA with an email highlighting the specific programs referenced during those discussions. The following commercial discounts/programs are not applicable to VMware's US Federal Government business:
> 1. Advantage + Opportunity Registration
> 2. Advantage + New Account
> 3. VPP
> 4. Influence +
> 5. ELA Registration
> All existing VMware Federal Government channel discount programs are run through our Government Dealer Program. Carahsoft is currently the only authorized VMware Government Dealer. All reselling partners must register and transact Federal Government business using Federal Government discount programs through Carahsoft.
> We discussed the USDA and DOE/INL transactions that were improperly priced by AltTech using commercial discount programs.

## VIII.   THE COVER UP:  RETALIATION AGAINST RELATOR

101. As Relator Smith reported, investigated, and attempted to stop the fraudulent conduct of Defendant VMware, VMware attempted to cover up its scheme by threatening, discriminating against, and ultimately discharging Relator.

102. Beginning in January 2009, Smith was asked to fully cooperate with VMware's ethics and compliance investigation involving Eschenbach and other VMware executives' fraudulent pricing practices of overcharging the federal government, partner and employee claims of unethical price fixing and restraints of trade, age and gender discrimination, and other acts of illegal workplace practices and corporate malfeasance. The investigation was led by Susan Insley, Vice President of Internal Audit at VMware ("Insley").

103. Smith took action to stop VMware's fraudulent practices and other illegal acts by fully cooperating with VMware Human Resources, Internal Audit, Compliance, and Ethics departments' requests for information by providing them with detailed reports when such violations occurred.

104. As part of VMware's ethics and compliance investigation, Smith met with Lori Martinez, VMware's Director of Ethics and Compliance ("Martinez"), and Insley in February 2009 to report VMware's fraudulent pricing practices of overcharging the federal government, as well as other fraudulent and unlawful conduct by senior VMware executives. These sessions

1    took place during the course of three (3) days for approximately 18 hours.  Additionally, Smith

2    exchanged emails and participated in phone calls with Martinez and Insley concerning VMware's

3    fraudulent pricing practices and other unlawful conduct by senior VMware executives.

4         105.    During these internal federal pricing investigation sessions, Smith explained how

5    Eschenbach and other senior executives at VMware manipulated federal pricing so that the

6    federal government paid more than VMware's commercial customers.  They manipulated federal

7    pricing by offering commercial customers a higher consolidation ratio (such as 10:1) than the

8    consolidation ratio offered to the government (such as 4:1); providing greater discounts when

9    selling to commercial buyers than when selling to the government through the Carahsoft

10   contract; using different methods to price their support services for commercial customers and

11   government purchasers, which resulted in lower annual maintenance prices for commercial

12   clients than for government customers; and employing different terms and conditions in

13   VMware's commercial business contracts than in Carahsoft's contracts for sales of VMware's

14   products to the government.  Smith also presented detailed spreadsheets which evidenced the

15   manipulation of the consolidation ratios by Eschenbach and other senior VMware executives.

16        106.    Beginning in or about the week of February 16, 2009, Insley met with, among

17   others, Steve Houck and Carl Eschenbach to discuss VMware's internal federal pricing

18   investigation into fraudulent pricing practices of overcharging the federal government, as well as

19   other fraudulent and unlawful conduct by senior VMware executives, including Eschenbach and

20   Scott Aronson, Vice President of Global Accounts.

21        107.    During the height of this internal federal pricing investigation, Smith was told to

22   watch out and be careful around Eschenbach and Aronson because Eschenbach suspected that

23   Smith had reported fraudulent federal pricing practices at VMware and blamed him for getting

24   investigated in the first place.

25        108.    Aware of the dangers that Eschenbach, Aronson, and other senior VMware

26   executives presented, Smith gave his wife specific written instructions in the event that he was

27   harmed during a business trip to Europe.

28        109.    Several months later, Smith continued to take action to stop VMware's fraudulent

practices and other illegal acts by giving deposition testimony in a matter filed by another former

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

VMware employee, John Wheeler, against VMware. VMware's in-house and outside counsel were present at the deposition. On August 11, 2009, he testified regarding VMware's fraudulent federal pricing practices:

> Q:  Have you ever seen or heard of any unfair pricing practices at VMware? (163:12-13)
>
> THE WITNESS: Yes. (163:16)
>
> Q:  Okay. Who has shared with you that they have seen unfair pricing practices at VMware? (163:22-23)
>
> A:  My federal organization when I was in the role of the Americas. (163:24-25)
>
> Q:  Who in your federal organization shared with you that they perceived or saw unfair pricing practices at VMware? (164:1-3)
>
> A:  Steve Hauck. (164:4)
>
> Q:  Anyone else beside Steve Hauck within the federal organization that shared with you his or her belief that there were unfair pricing practices within VMware? (164:18-21)
>
> A:  Leigh Madden. (164:22)
>
> Q:  Anyone else? (165:3)
>
> A:  Joel Davis. (165:4)
>
> Q:  Anyone else? (165:5)
>
> A:  Jennifer Baker. (165:6)
>
> Q:  What did Steve Hauck tell you about what he perceived or saw at VMware in terms of unfair pricing practices? (165:9-11)
>
> A:  He had received complaints from his channels employees that supported the federal group. He had spoken with partners - this is what he shared with me - that were making strong claims of unfair pricing or trying to prevent partners from being involved in opportunities.
>
> He suggested that he knew that we were pricing the products differently in the federal space and that we had not done our due diligence on how to do that appropriately without creating an issue for same product, different price for the government. (165:12-22)
>
> . . . .
>
> Q:  Okay. When he was sharing these concerns with you about channel employees complaining, partners pricing in the federal space, and it just needed to be fixed quickly, was he asking you to support him in raising this with upper management? (166:15-19)

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

| | |
|---|---|
| A: | Yes. (166:20) |
| Q: | And did you support him in raising this issue with upper management? (166:21-22) |
| A: | Yes. (166:23) |
| Q: | Who in upper management at VMware did you raise Steve Hauck's concerns about the channel employees complaining and the partners complaining about pricing-related issues and that it needed to be fixed quickly? (167:18-22) |
| A: | Brian Almas. (168:10) |
| Q: | Okay. (168:11) |
| A: | Carl Eschenbach, Leigh Madden, Brandon Sweeney, Joel Davis. There is no one else. (168:12-13) |
| Q: | During what period of time were you talking to Brian, Carl, Leigh, Brandon and Joel about the subject of these pricing issues at VMware? (169:1-3) |
| A: | Late spring, let's say May, June of 2008, July, August 2008. (169:4-5) |
| Q: | So why don't you tell me what the message you delivered to Joel, Brandon, Carl and Leigh meant. (169:13-14) |
| A: | Was that we had had a number of instances where people were concerned, that maybe we needed to look into this more deeply. That Steve was assembling a team, which I think was just a small group of people, to look into this in detail. (169:15-19) |
| Q: | What is "this"? (169:20) |
| A: | The potential Sarbanes-Oxley price - pricing parody or pricing concerns for the federal government, as well as channel conflict issues. (169:21-23) |

110.    Approximately five months later, on January 10, 2010, Smith took further action to stop VMware's fraudulent practices and other illegal acts. He sent a detailed email to VMware employees Insley, Betsy Sutter, and Michelle Brennan, detailing numerous retaliatory acts by Eschenbach and other VMware employees against him for reporting VMware's fraudulent federal pricing practices and other illegal conduct and activities. Smith also expressed concern that he would suffer additional retaliation by Eschenbach and other senior VMware executives.

111.    Four days later, on January 14, 2010, VMware terminated Smith.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

112.     VMware terminated Smith's employment as a retaliatory act against Smith for engaging in lawful acts in furtherance of an action under section 31 U.S.C. § 3729. (i) Smith cooperated with VMware Human Resources, Internal Audit, Compliance, and Ethics departments, and its internal federal pricing investigation in early 2009 into fraudulent VMware practices involving overcharges to the federal government. (ii) Smith gave truthful deposition testimony regarding VMware's fraudulent federal pricing practices in the John Wheeler matter in August 2009. (iii) Smith sent emails and made other reports to VMware concerning VMware's fraudulent federal pricing practices and overcharging of the federal government, and documented the retaliation and other discrimination he suffered by VMware through January 10, 2010.

113.     Shortly after Smith was terminated, Houck was forced to resign from VMware because he led the investigation in 2008 into VMware's federal pricing issues and enlisted Smith to raise his federal pricing concerns to VMware's upper management (Brian Almas and Eschenbach). Houck, who reported to VMware, Eschenbach, Black, and Smith, also reported his concerns regarding VMware's federal pricing issues to his subordinates, including Leigh Madden, Brandon Sweeney, and Joel Davis, and others at VMware. Smith reported Houck's concerns regarding VMware's federal pricing practices to VMware's Human Resources (Brian Almas and Michelle Brennan), Insley, and Martinez, and was told that they had brought this matter to the attention of the Audit Committee of VMware's Board of Directors. In fact, everyone who conducted the 2008 investigation led by Houck was forced out of VMware.

114.     Thus at all times relevant hereto, each Defendant "knew" or acted "knowingly," as those terms are defined in 31 U.S.C. section 3729, subdivision (b)(1), in making, presenting, or submitting false claims. In that respect, each Defendant acted:

(a)     With actual knowledge of the information; or

(b)     In deliberate ignorance of the truth or falsity of the information; or

(c)     With reckless disregard of the truth or falsity of the information.

115.     This case demonstrates a carefully orchestrated scam designed to abscond with taxpayer dollars.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

## IX.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### On Behalf of the United States

#### Federal False Claims Act, Presenting False Claims

#### 31 U.S.C. § 3729(a)(1)(A)

116.   Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 115 of this Complaint as though fully set forth herein.

117.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

118.   Through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States, within the meaning of 31 U.S.C. § 3729(a)(1)(A)(this provision replaces 31 U.S.C. § 3729(a)(1), which was in effect until the False Claims Act was amended on May 20, 2009).

119.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### SECOND CAUSE OF ACTION

#### On Behalf of the United States

#### Federal False Claims Act, Making or Using False Records or Statements

#### Material to Payment or Approval of False Claims

#### 31 U.S.C. § 3729(a)(1)(B)

120.   Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 115 of this Complaint as though fully set forth herein.

121.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

122.   Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records and statements material to a false and fraudulent

1  claim, within the meaning of 31 U.S.C. § 3729(a)(1)(B)(this provision replaces 31 U.S.C. §

2  3729(a)(2), which was in effect until the False Claims Act was amended on May 20, 2009).

3      123.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a

4  substantial factor in causing the United States to sustain damages in an amount according to

5  proof.

6                    **THIRD CAUSE OF ACTION**

7                    **On Behalf of the United States**

8      **Federal False Claims Act, Conspiracy to Commit Violations**

9                    **31 U.S.C. § 3729(a)(1)(C)**

10     124.   Plaintiff incorporates by reference and reallege all of the allegations contained in

11 paragraphs 1 through 115 of this Complaint as though fully set forth herein.

12     125.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) conspired to

13 commit violations of substantive portions of the False Claims Act, including but not limited to

14 subparagraphs (A), (B), and (G) of 31 U.S.C. § 3729.

15     126.   Defendants conspired to: (1) knowingly present false records and statements; (2)

16 knowingly make, use, and/or cause to be made and used false records and statements; and (3)

17 knowingly make, use, or cause to be made or used, a false record or statement material to an

18 obligation to pay or transmit money or property to the Government, or knowingly concealed or

19 knowingly and improperly avoided or decreased an obligation to pay or transmit money or

20 property to the Government.

21     127.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(C) and was a

22 substantial factor in causing the United States to sustain damages in an amount according to

23 proof.

24

25

26

27

28 / / /

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**FOURTH CAUSE OF ACTION**

**(In the Alternative)**

**On Behalf of the United States**

**Federal False Claims Act, Retention of Proceeds to Which Not Entitled**

**31 U.S.C. § 3729(a)(1)(G)**

128.     Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 115 of this Complaint as though fully set forth herein.

129.     In the alternative, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

130.     As discussed above, Defendants received far more money from the Government than they were entitled to.  Defendants knew that they had received more money than they were entitled to, and avoided their obligation to return the excess money to the Government.

131.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**FIFTH CAUSE OF ACTION**

**On Behalf of Relator**

**Federal False Claims Act, Retaliation**

**31 U.S.C. § 3730(h)**

132.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 115 above as though fully set forth herein.

133.     VMware is covered by this retaliatory discharge statute, 31 U.S.C. §3730(h), because it sells information technology products and services to the federal government.

134.     Through reporting, investigating, and attempting to stop the fraudulent conduct of Defendant VMware, Relator Smith was threatened, discharged and discriminated against in the terms and conditions of his employment by VMware because of lawful acts done by the Relator in furtherance of an action under section 31 U.S.C. § 3729.

135.   Relator is entitled to all relief necessary to make him whole, including but not limited to  reinstatement with the same seniority to the position he had before the unlawful termination, total target compensation as Vice President and General Manager of Americas Field Operations from 2008 to present, over-goal commissions from 2008 to present, annual merit increases from 2008 to present, continuation of all benefits from 2008 to.present, 2 times the amount of back pay lost, annual merit increases that were earned but unpaid for 2008, 2009, and 2010,  interest on the back pay, payment for the gains earned on non-qualified and restricted stock options, payment for the gains earned on non-qualified stock options and restricted stock units which were earned but not actually received, damage to his reputation and ability to find comparable employment in the future, compensation for any other special damages sustained as a result of the discrimination, and attorney's fees and costs.

## SIXTH CAUSE OF ACTION

### On Behalf of Relator

### Wrongful Termination in Violation of Public Policy

136.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 115 above as though fully set forth herein.

137.   In doing the things herein alleged, Defendant VMware threatened, harassed and discriminated against Smith in the terms and conditions of his employment and ultimately terminated that employment.

122.   This conduct was in violation of public policies pursuant to various state and federal laws, and to punish Smith for his opposition to Defendant VMware's fraudulent and illegal practices.

123.   In doing the things herein alleged, Defendant violated public policy by retaliating against Smith, including creating an intolerable working environment and ultimately terminating his employment.

124.   As a direct and proximate cause of Defendant VMware's wrongful conduct, Smith has suffered damages, including, but not limited to, loss of salary, commissions, annual merit increases, benefits, stock options, and other valuable employee benefits.  Additionally, the actions of defendant VMware were carried out in a deliberate manner in conscious disregard of

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

1   the rights of Smith and were malicious, despicable and were intended to harm him. Relator is

2   therefore entitled to punitive damages against Defendant VMware in an amount sufficient to

3   punish defendant, and to deter future similar misconduct.

4   **X.     PRAYER FOR RELIEF**

5          WHEREFORE, Plaintiffs, by and through Relator Dane Smith, pray judgment in their

6   favor and against Defendants as follows:

7          1.      That judgment be entered in favor of plaintiff UNITED STATES OF AMERICA

8   ex rel. DANE SMITH, and against Defendants VMWARE, INC. and CARAHSOFT

9   TECHNOLOGY CORP., according to proof, as follows:

10         a.     On the First Cause of Action (Presenting False Claims (31 U.S.C. §

11                3729(a)(1)(A))) damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

12                i.     Triple the amount of damages sustained by the Government;

13                ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false

14                       claim;

15                iii.   Recovery of costs;

16                iv.    Pre- and post-judgment interest;

17                v.     Such other and further relief as the Court deems just and proper;

18         b.     On the Second Cause of Action (False Claims Act; Making or Using False

19                Records or Statements Material to Payment or Approval of False Claims (31

20                U.S.C. § 3729(a)(1)(B))) damages as provided by 31 U.S.C. § 3729(a)(1) in the

21                amount of:

22                i.     Triple the amount of damages sustained by the Government;

23                ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false

24                       claim;

25                iii.   Recovery of costs;

26                iv.    Pre- and post-judgment interest;

27                v.     Such other and further relief as the Court deems just and proper;

28

c.      On the Third Cause of Action (False Claims Act; Conspiracy to Commit Violations (31 U.S.C. § 3729(a)(1)(C))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

     i.      Triple the amount of damages sustained by the Government;

     ii.      Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

     iii.      Recovery of costs;

     iv.      Pre- and post-judgment interest;

     v.      Such other and further relief as the Court deems just and proper; and

d.      On the Fourth Cause of Action (False Claims Act, Retention of Proceeds to Which Not Entitled (31 U.S.C. § 3729(a)(1)(G))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

     i.      Triple the amount of damages sustained by the Government;

     ii.      Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

     iii.      Recovery of costs;

     iv.      Pre- and post-judgment interest;

     v.      Such other and further relief as the Court deems just and proper.

2.      Further, Relator, on his own behalf, pursuant to 31 U.S.C. section 3730(d), requests that he receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States, plus an amount for reasonable expenses incurred, plus relator's attorneys' fees and costs of this action. Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

3.      Further, Relator requests that, as a result of VMware's unlawful employment actions, Relator receive all relief necessary to make him whole pursuant to 31 U.S.C. § 3730(h), including reinstatement, lost earnings, commissions, merit increases, benefits, back-pay, interest, losses on stock options, damage to reputation and other consequential damages, compensation for any other special damages, double damages, and attorney's fees and costs;

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

1    4.    That, as a result of VMware's unlawful employment actions, Relator receive all

2  relief necessary to make him whole pursuant to federal and state causes of action for wrongful

3  employment conduct, retaliation, and termination;

4    5.    That, as a result of VMware's violation of public policy, Relator receive all relief

5  necessary to make him whole pursuant to federal and state law, including punitive damages;

6    6.    That Relator be awarded all costs of this action, including attorneys' fees and

7  expenses; and

8    7.    That Relator recover such other and further relief as the Court deems just and

9  proper.

10

11  Dated: February 29, 2012          **FRIEDLANDER, FRIEDLANDER & EARMAN, P.C.**

12

13                By: _____

14                    MARK P. FRIEDLANDER, JR.
                       *Attorneys for Relator and Plaintiff Dane Smith*

15  DATED:  February 29, 2012         **COTCHETT, PITRE & McCARTHY, LLP**

16

17

18                By: _____
                       NIALL P. McCARTHY
19                    JUSTIN T. BERGER
                       *Attorneys for Relator and Plaintiff Dane Smith*

20  DATED:  February 29, 2012         **LAW OFFICES OF JEFFREY F. RYAN**

21

22

23                By: _____
                       JEFFREY F. RYAN
24                    *Attorneys for Relator and Plaintiff Dane Smith*

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**FIRST AMENDED COMPLAINT;  Case No. 1:10cv769 (JCC/JFA)**                         35