JEFFREY F. RYAN (CA Bar No. 129079)
**LAW OFFICES OF JEFFREY F. RYAN**
The Fitzpatrick Building
2000 Broadway Street
Redwood City, CA  94063
Phone: (650) 924-8343
jeff@jeffreyryanlaw.com

Attorneys for Plaintiff Dane Smith

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| DANE SMITH,<br><br>      Plaintiff,<br><br>*vs*.<br><br>VMWARE, INC.,<br><br>      Defendant. | CASE NO. 4:15-cv-03750-HSG<br><br>**NOTICE OF MOTION AND MOTION TO VACATE ARBITRATION AWARD; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF**<br><br>**[Accompanied by DECLARATIONS OF DANE SMITH & JEFFREY F. RYAN w/EXHIBITS; [proposed] ORDER]**<br>   **(9 U.S.C. § 10,** *et seq.***)**<br><br>**Date:** December 7, 2017<br>**Time**: 2:00 p.m.<br>**Crtrm**: 2<br><br>Honorable Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................ **i**

**TABLE OF AUTHORITIES** ....................................................................................... **ii**

I.    **Jurisdictional Background** ................................................................. **2**

II.   **Procedural History** ............................................................................. **3**

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................... **3**

I.    **Introduction & Summary of Argument** .......................................... **3**

II.   **Discussion** ........................................................................................... **10**

    A.  **The arbitration was rendered fundamentally unfair, within the meaning of 9 U.S.C. 10(a)(3), by Judge Cahill's refusal to admit and consider pertinent and material evidence after assuring Smith that he would.** ....................................... **10**

    B.  **The award must be vacated because Judge Cahill was willfully inattentive to 31 U.S.C. § 3730(h), and the payment by VMware of what was ordered offends the public policy underlying that statute** ............................................... **17**

       a.  **Ignoring the Procedural Rules** ..................................... **18**
       b.  **Reputational Damages** .................................................. **18**
       c.  **Attorney Fees** ................................................................ **19**

    C.  **The award must be vacated on account of Judge Cahill's failure to disclose his relationship with Patricia Gillette** ........................................................ **21**

III.  **CONCLUSION** ................................................................................... **25**

# TABLE OF AUTHORITIES

## <u>CASES</u>

<u>Page</u>

*Applied Indus. Materials Corp. v. Ovalar Makine Ticaret ve Sanayi, A.S.*
492 F.3d 132, 137 (2d Cir. 2007) ................................... 24

*Comedy Club, Inc. v. Improv W. Assocs.*
553 F.3d 1277, 1290 (9th Cir. 2009) ................................ 17

*Coszalter v. City of Salem*
320 F.3d 968, 977- 978 (9th Cir. 2003) ............................ 14

*Ficek v. Southern Pac. Co.*
338 F.2d 655, 657 (9 C.A.) ........................................ 15

*George Watts & Son, Inc. v. Tiffany and Co.*
248 F.3d 577 (7th Cir.2001) ...................................... 17

*Gilmer v. Interstate/Johnson Lane Corp.*
500 U.S. 20, 26, 111 S. Ct. 1647, 1652, 114 L. Ed. 2d 26 (U.S. 1991) .... 9

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*
545 U.S. 409, 125 S. Ct. 2444 (2005) ............................. 9

*Gray v. Chiu*
212 Cal. App. 4th 1355, 1358 (2013) ............................. 25

*Halliburton, Inc. v. Admin. Review Bd.*
771 F.3d 254, 266–67 (5th Cir. 2014) ............................ 9

*Halligan v. Piper Jaffray, Inc.*
148 F.3d 197, 204 (2d Cir.1998) ................................. 8

*Hammond v. Northland Counseling Center, Inc.*
218 F.3d 886, 892 (8th Cir. 2000) ............................... 9

*Hanna v. WCI Communities, Inc.,*
348 F. Supp. 2d 1332, 1334 (S.D. Fla. 2004) ..................... 7

*Harvey Aluminum (Inc.) v. United Steelworkers of Am., AFL-CIO*
263 F. Supp. 488, 493 (C.D. Cal. 1967) .......................... 5, 15

*Hoteles Condado Beach v. Union De Tronquistas Local 901*
763 F.2d 34, 39 (1st Cir.1985) .................................. 5, 10

*In re Sussex*
781 F.3d 1065, 1074 (9th Cir. 2015) ............................. 24

*Iran Aircraft Indus. v. Avco Corp.,*
980 F.2d 141, 146 (2d Cir. 1992) ............................... 5, 17

*Jones v. Southpeak Interactive Corp. of Delaware*
777 F.3d 658, 672 (4th Cir. 2015)                                        7

*Kashner Davidson Sec. Corp. v. Mscisz*
531 F.3d 68, 77–78                                                       18

*Kyocera Corp. v. Prudential–Bache Trade Servs.*
341 F.3d 987, 997 (9th Cir.2003)                                         8

*McDonnell Douglas Corp. v. Green*
411 U.S. 792, 805, 93 S. Ct. 1817, 1826, 36 L. Ed. 2d 668 (1973)         6

*Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*
44 F.3d 826, 832 (9th Cir.1995)                                          17

*Morales v. City of San Rafael*
96 F.3d 359, 364, fn. 8. (9th Cir. 1996)                                 9

*Moreno v. City of Sacramento*
534 F.3d 106, 1112 (9th Cir. 2008)                                       8

*Neal v. Honeywell Inc.*
33 F.3d 860, 863 (7th Cir. 1994)                                         9, 21

*New Regency Prods., Inc. v. Nippon Herald Films, Inc.*
501 F.3d 1101, 1106 (9th Cir. 2007)                                      24

*Paladino v. Avnet Computer Techs., Inc.*
134 F.3d 1054, 1062 (11th Cir.1998)                                      20

*Price v. Taylor*
575 F.Supp.2d 845, 854 (N.D. Ohio 2008)                                  20

*Schmitz v. Zilveti*
20 F.3d 1043 (9th Cir.1994)                                              24

*Sunshine Min. Co. v. United Steelworkers of Am., AFL-CIO, CLC*
823 F.2d 1289, 1295 (9th Cir. 1987)                                      10

*Tempo Shain Corp. v. Bertek, Inc.*
120 F.3d 16, 20 (2d Cir. 1997)                                           16

*Thomas Kinkade Co. v. White*
711 F.3d 719, 724 (6th Cir. 2013)                                        7, 25

*Ting v. AT & T,*
182 F. Supp. 2d 902, 934 (N.D. Cal. 2002)                                23
319 F.3d 1126 (9th Cir. 2003)                                            23

*Townsend v. Bayer Corp.*
774 F.3d 446, 457 (8th Cir. 2014)                                        16

*Turnberry/ MGM Grand Towers, LLC, v. Sussex*
136 S. Ct. 156 (2015)                                                    24

*U.S. Life Ins. Co. v. Superior Nat. Ins. Co.,*
591 F.3d 1167, 1175 (9th Cir. 2010)                                4

*Wadler v. Bio-Rad Labs., Inc.*
212 F. Supp. 3d 829, 849 (N.D. Cal. 2016)                          21

*Williams v. Pharmacia, Inc.*
137 F.3d 944, 953 (7th Cir. 1998)                                  20

## STATUTES & RULES

| | Page |
|---|---|
| 9 U.S.C. §10 | 2, 25 |
| 9 U.S.C. §10(a)(2) | 1, 21 |
| 9 U.S.C. §10(a)(3) | 1, 17 |
| 9 U.S.C. §10(a)(4) | 1, 8, 17 |
| 28 U.S.C. §1331 | 2 |
| 28 U.S.C. §§1391(b) | 2 |
| 28 U.S.C. §1395(a) | 2 |
| 31 U.S.C. §3729, *et seq* | 2 |
| 31 U.S.C. §3730 | 2 |
| 31 U.S.C §3730(c) | 1 |
| 31 U.S.C. §3730(h) | 17, 18 |
| 31 U.S.C. §3730(h)(1) | 1, 7 |
| 31 U.S.C. §3732 | 2 |
| 31 U.S.C. §3732(a) | 2 |
| CRC Ethics Standards, Standard 7(d)(15)(A) | 25 |
| California CCP § 1281.9(a) | 25 |
| Code Civ. Proc., § 1280 et seq. | 25 |
| Title 9, United States Code, § 10(c) | 15 |

1

**NOTICE & MOTION**

2

TO DEFENDANT VMWARE, INC, AND ITS ATTORNEYS OF RECORD:

3

   **NOTICE IS HEREBY GIVEN** that on December 7, 2017, at 2:00 p.m., or as soon

4

thereafter as the matter may be heard before the Honorable Haywood S. Gilliam, Jr., in Courtroom

5

2, located on the 4th Floor at 1301 Clay Street, Oakland, CA 94612, Plaintiff Dane Smith

6

("SMITH") will, and hereby does, move the Court for an Order **(1)** vacating the July 17, 2017

7

Final Award made in the arbitration between Smith and defendant VMWARE, INC. ("VMware")

8

before the Hon. William J. Cahill (Ret.), JAMS Arbitration/San Francisco Division Reference

9

Number 1100083272, and **(2)** remanding the matter for a new arbitration before a different

10

arbitrator unaffiliated with JAMS. This Motion is made on the grounds that the award is:

11

   **1.**   The product of the arbitrator's misconduct, within the meaning of 9 U.S.C.

12

10(a)(3), in that Judge Cahill denied Smith a fair opportunity to present his evidence and argue it,

13

and refused to hear and consider Smith's pertinent and material evidence after telling him that he

14

would do so in the form the arbitrator had prescribed, but then rejecting that form.

15

   **2.**   In "manifest disregard of the law," and violative of the "public policy" behind

16

that law, as contemplated by 9 U.S.C. 10(a)(4), in that **(a)** the arbitrator ignored the plainly stated

17

procedural rules incorporated in the agreement to arbitrate, **(b)** the award omits damages for the

18

reputational injury suffered by Smith, despite the arbitrator's knowledge of his *mandatory* duty to

19

"make [Smith] whole" by awarding such "special damages" under 31 U.S.C § 3730(h), and **(c)** the

20

award also reflects Judge Cahill's willful inattentiveness to that same statute's  requirement for

21

adequate and reasonable fees for Smith's attorneys, which are also included in the "special

22

damages" that <u>must</u> be fully compensated under the aforesaid "make whole" provision.

23

   **3.**   Tainted and must be vacated because of the "evident partiality," within the

24

meaning of 9 U.S.C. § 10(a)(2), of Judge Cahill, who failed to <u>directly</u> disclose, in violation of the

25

controlling disclosure statutes, Code of Civil Procedure sections 1281.85, *et seq*., <u>and JAMS' own</u>

26

<u>rules</u>, that a former VMware counsel (and partner of VMware's current counsel), who, under the

27

guise of *representing* <u>both</u> Smith and VMware during an earlier lawsuit by another VMware

28

employee, became privy (and witness) to Smith's protected activities of investigating, reporting

and trying to stop VMware's illegal billing of the U.S. Government and its violations of the Sarbanes-Oxley Act ("SOX"), then later represented VMware *against* Smith in the early stages of his claims for employment retaliation that form the basis of the arbitration at issue here, had, at some point shortly before the arbitration hearing, herself become Judge Cahill's partner as a JAMS' *neutral* in the same San Francisco office, which precluded Smith from calling her as a material witness.

The motion is based on this Notice, the within memorandum of points and authorities; the concurrently filed Declarations of Jeffrey F. Ryan, and Dane Smith, and the exhibits thereto appended; on the official transcripts of the arbitration proceedings, which are lodged separately, and upon the papers and records on file in this case, and such further documentary evidence and argument of counsel as may be presented at the time of the hearing.

Dated: October 13, 2017.

LAW OFFICES OF JEFFREY F. RYAN[1]
An Association of Attorneys

`                          By /s/
                                  JEFFREY F. RYAN
                                  Counsel for Plaintiff Dane Smith

## I.      Jurisdictional Background

On July 9, 2010, Dane Smith filed an action in the United States District Court for the Northern District of Virginia, case number 1:10-cv-00769-JCC-JFA, as *qui tam* relator under the False Claims Act (31 U.S.C. 3729, *et seq*; "FCA."), and individually for FCA retaliation under 31 U.S.C. §3730 and wrongful termination in violation of public policy under California common law (a "*Tameny*" claim). (**Dkt. #1**). The operative, Third Amended Complaint ("TAC"), filed April 8, 2014, alleged subject matter jurisdiction under 28 U.S.C. §1331 and 31 U.S.C. §3732, and personal jurisdiction and venue under 28 U.S.C. §§1391(b) and 1395(a), and 31 U.S.C. §3732(a). (**Dkt. #39**, page 7 of 62). As to this motion, this Court also has jurisdiction under 9 U.S.C. §10.

---

[1] The scope of representation agreed upon by Smith and his co-counsel, Niall P. McCarthy, Esq., Cotchett, Pitre & McCarthy ("CPM"), and Jeffrey F. Ryan, Esq., limits McCarthy/CPM involvement to proceedings occurring up to issuance of the Final Award challenged in this motion, while Ryan is solely responsible for all post-arbitration proceedings. Ryan Dec ISO Vacatur

## II.   **Procedural History**

As part of VMware's settlement of the *qui tam* action with Smith and the Government, the Court ordered that Smith's FCA retaliation and *Tameny* claims be transferred to the Northern District of California (**Dkt. #'s 60, 61**),[2] where the matter was assigned to Judge Henderson, case number 3:15-cv-03750-THE. (**Dkt. #65**). Over Smith's objection, VMware's motion to compel arbitration was granted, and Judge Henderson dismissed Smith's federal case, number 3:15-cv-03750-THE, without prejudice on January 5, 2016. (**Dkt. # 83**)

Smith's Arbitration Complaint was filed January 22, 2016, and by reference incorporated the aforesaid TAC (**Dkt. #39**). A true copy of the Arbitration Complaint is at **Exhibit "A"** to the separately-filed <u>Declaration of Jeffrey F. Ryan In Support of Vacatur</u>, and the "Key Employment Agreement" containing the arbitration agreement is at **Dkt. # 76-2**, and was quoted by Judge Henderson at **Dkt. # 83**, pp. 1 – 2.

On July 17, 2017, the arbitrator, Hon. Wm. J. Cahill (ret.), issued his Final Award, which by reference incorporated his earlier Interim Awards. The Final Award, followed by the Interim Awards, *in seriatim*, is/are at **Exhibit "B"** to <u>Ryan Declaration ISO Vacatur</u>.[3]

## MEMORANDUM OF POINTS & AUTHORITIES

### I.   **Introduction & Summary of Argument.**

Dane Smith, as *qui tam* relator, was instrumental in the recovery by the United States Department of Justice of **$75.5 million** (**Dkt.# 77**, p. 5 of 13) of the hundreds of millions of dollars of which VMware had defrauded the Government, as detailed in the TAC. (**Dkt. # 39**.).

Judge Cahill, the retired state court judge and JAMS arbitrator in this case, *did* find that VMware had retaliated against Smith for trying to investigate, report and stop billing practices that defrauded the United States.[4] But Smith was not "made whole" for the injuries he suffered from

---

[2] The arbitrator took judicial notice of said Settlement Agreement. <u>**See**</u>, **Exhibit "B,"** SMITH15, fn. 1. **NB**. All Docket Numbers preceding #86 are in case number 3:15-cv-03750-THE.

[3] Hereinafter, all **"bold" Exhibit** references are to those *related* to <u>Ryan's Declaration ISO Vacatur</u>, except for **Exhibit "W,"** which is related to <u>Dane Smith's Declaration ISO Vacatur</u>. For convenience of Court and counsel, exhibits are Bates-stamped, e.g., "SMITH00005."

[4] <u>See</u>, e.g., (**Exhibit "D"**), SMITH0141 ¶ 24: "It was **only** the U.S. government and constituent state governments who used GSA pricing that paid more for exactly the same products and services."

employment retaliation in violation of the False Claims Act ("FCA"), and wrongful termination in violation of public policy under California law. Instead of the $35 million that Smith's expert had calculated that Smith was due (**Exhibit "E"**), Judge Cahill awarded roughly $300,000. (**Exh. "B,"** at pp. SMITH12). An earlier Ninth Circuit case tells the tale:

> This case is not similar to the arbitral misconduct in ***Gulf Coast Industrial Workers Union v. Exxon Co., USA,* 70 F.3d 847 (5th Cir.1995)**, <u>where the arbitrator misled a party into believing that evidence was admitted, but then ruled against the party because it failed to present evidence on the very point to which the excluded evidence was central.</u> Nor is this case similar to the arbitral misconduct in ***Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 506 v. E.D. Clapp Corp.,* 551 F.Supp. 570, 578 (N.D.N.Y.1982)**, <u>where the party was not given an opportunity to complete its presentation of proof prior to the arbitration decision.</u> Here, the panel allowed each party the opportunity to complete its presentation by submitting a brief and participating in the hearing.

*U.S. Life Ins. Co. v. Superior Nat. Ins. Co.,* 591 F.3d 1167, 1175 (9th Cir. 2010). Emphasis added.

Smith had been assured by the JAMS Rules and the procedures/ rules set forth in Judge Cahill's "Scheduling Order," *which by law became part of the arbitration agreement itself*, that his sworn "Declaration in Support of Arbitration Brief" (**Exh. "D,"** SMITH128, *et seq.*) would, <u>in concert</u> with his live testimony, be admitted and considered as evidence because he was available for cross-examination; that the exhibits identified and referenced in that Declaration were also deemed admitted, absent any <u>pre-hearing</u> objections by VMware, and there were none interposed .

Based on those promises Smith's counsel calculated that he would need to take Smith on direct examination "for 7 hours." But because Judge Cahill **(a)** tacitly sustained VMware's objection,[5] which was not interposed until the first day of the actual arbitration hearing, that it would be "crazy" to admit *both* Smith's Declaration and his live testimony, and **(b)** later *ruled* that he expected compliance with the California Evidence Code,[6] many of the indisputable, and undisputed, facts proving Smith's engagement in protected activities during the final 6 months of his employment at VMware, and VMware's knowledge of those activities and consequent employment retaliation against Smith, and the *purportedly-admitted* exhibits supporting those

---

[5] "Tacitly" in that Judge Cahill substituted an impromptu, previously unannounced, *rule* requiring that the parties "stipulate" to the admission of such declarations.

[6] **1 Tr. 105 – 106.** But JAMS Rule 22, provides, in part, "(d) Strict conformity to the rules of evidence is not required, except that the Arbitrator shall apply applicable law relating to privileges and work product." **Exhibit "F,"** at SMITH232.

factual averments were never even considered by the arbitrator.

Instead, Judge Cahill issued Interim Awards, incorporated by reference into his Final Award (**Exh. "B"**), *finding* that there was insufficient evidence of protected activities by Smith after August, 2009, and of any adverse employment actions taken against him by VMware after that date, even though, for example, the pretextual nature of his termination in January, 2010 was palpable. This is precisely what happened in the *Gulf Coast* case cited by the Ninth Circuit at 591 F.3d 1167, 1175. And <u>see</u>, *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992) (**proceeding was *fundamentally unfair* because arbitrator disregarded evidence on account of its form even though the arbitrator had previously approved that form**).

Judge Cahill's disregard of the rules was devastating, as Smith was deprived of his right to present the readily available proof of the facts he had so meticulously set forth in the TAC at **Dkt. # 39**, pp. 40 – 58 of 62. Smith gave Judge Cahill an opportunity to cure the error by submitting, *prior to the issuance of the Final Award*, an Application to Reopen the Hearing (**Exh. "G"**), as contemplated by JAMS' own Rule 22.[7]   In that application, Smith cited the authority supporting vacatur where the arbitrator refuses to give a party a fair opportunity to present his case, e.g., *Hoteles Condado Beach v. Union De Tronquistas Local 901,* 763 F.2d 34, 39 (1st Cir.1985), and *Harvey Aluminum (Inc.) v. United Steelworkers of Am., AFL-CIO*, 263 F. Supp. 488, 493 (C.D. Cal. 1967) **[**"**The failure to receive and consider the material and pertinent testimony in the circumstances appears to have denied to the petitioner a fair hearing.**"**]**

Had the Declaration in Support of Arbitration Brief and supporting exhibits that Smith had submitted and served on Respondent VMware, <u>in accordance with Judge Cahill's Scheduling Order,</u> been received in evidence, none of the evidentiary deficiencies cited by Judge Cahill *could* have existed. This is what happened in the cases cited by the Ninth Circuit in *U.S. Life*, *ante*, and is contrary to what the Supreme Court emphasized repeatedly is applicable in such cases: "In short, on the retrial respondent **must be given a full and fair opportunity** to demonstrate by competent evidence that the presumptively valid reasons for his [termination] were in fact a

---

[7] JAMS Rule 22, subdivision (i), provides, in part, "At any time before the Award is rendered, the Arbitrator may, *sua sponte* or on application of a Party for good cause shown, reopen the Hearing. If the Hearing is reopened, the time to render the Award shall be calculated from the date the reopened Hearing is declared closed by the Arbitrator." **Exh. "F,"** SMITH233.

coverup for a [retaliatory employment] decision." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S. Ct. 1817, 1826, 36 L. Ed. 2d 668 (1973).

Coincidentally, much of the *unadmitted* (de-admitted?) evidence set forth in Smith's Declaration, and corroborating exhibits, detailed his interactions with Patricia Gillette, a partner in the same Orrick firm that represented VMware at the arbitration; the same Patricia Gillette who became one of Judge Cahill's same-office JAMS partner-colleagues 3 months before the arbitration hearing itself, but without any formal, <u>direct disclosure by Judge Cahill, or VMware</u>, to Smith.[8] In his Declaration (**Exh. "D,"** SMITH195), and in a May 20, 2016 pre-hearing letter to VMware's counsel seeking the Orrick firm's recusal (**Exh. "H**," SMITH306), Smith had described when she purported to represent <u>both</u> Smith and VMware, and the debilitating conflict it posed for Orrick's continued representation of the latter against the former, considering the detail of the information Smith had imparted to her about the very same issues and facts underlying the arbitration. **Exh. "D,"** SMITH195 – 198. An exchange between Judge Cahill and VMware's counsel during the challenged arbitration hearing reveals the disturbing import of this issue:

> MR. RYAN:      Mr. Smith, …who were you represented by in the Wheeler deposition?
>
> MR. SMITH:     **Pat Gillette**…
>
> JUDGE CAHILL:  This is going to be mess. Okay.
>
> MS. HERMLE:    You think?

**4 Tr. 892:11.**

While Smith and his counsel received several notices from JAMS that Judge Cahill had accepted other, concurrent assignments as a neutral in cases where the Orrick firm, and, in some instances, the <u>same </u>counsel now representing VMware, were involved (**Exh. "T,"** SMITH687), the fact that <u>no such similar, case-specific disclosure</u> was made regarding Patricia Gillette's status as Judge Cahill's new partner/colleague at the same time the evidence critical of her, undermining VMware's claim that it was not aware of Smith's FCA and SOX violation reports, but

---

[8] To be clear, in October of 2016, Smith's counsel received an email "blast," or mass-mailing apparently sent to all attorneys with whom JAMS had done business, announcing that Ms. Gillette had joined the organization as a neutral. But that *announcement* does not resemble, in form or substance, the formal JAMS *disclosures* discussed *post*, and shown at **Exhibit "T."**

*substantiating Smith's allegations*, was effectively being suppressed, is malodorous, even if the emailed "blast" transmitted 10 months into the process may be deemed a "disclosure."**[9]**

Incredibly, JAMS won't tell <u>Smith</u> to this day just how much VMware paid for the arbitration. <u>See</u>, **Exhibit "W,"** SMITH699. As the Sixth Circuit cast it in vacatur proceeding, "…we entirely agree with the district court that, '[w]hen the neutral arbitrator engages in or attempts to engage in mid-arbitration business relationships with non-neutral participants, it jeopardizes what is supposed to be a party-structured dispute resolution process.'" *Thomas Kinkade Co. v. White*, 711 F.3d 719, 724 (6th Cir. 2013).**[10]**

The third ground for vacatur---that Judge Cahill's award is in "manifest disregard of the law"---arises not only from his disregard of procedural rules that became part and parcel of the arbitration agreement, but also from the fact that in briefing before, during and after the actual hearing, Smith cited settled authority pertaining to the remedies that are <u>mandatory</u> under 31 U.S.C. §3730(h)(1) [the False Claims Act states that a prevailing plaintiff "**<u>shall</u>** be entitled to **<u>all</u>** <u>relief necessary to make that [plaintiff] whole</u>."], which Judge Cahill acknowledged (**Exh. "B,"** Interim Award #2, at SMITH040; Final Award, SMITH0006.). Included in such relief are "<u>reputational damages</u>," as Smith set forth in his post-hearing Brief re: Damages, and in his "Reply to Opposition to Points & Authorities in Support of Reputational Damages," filed March 31, 2017 (together at **Exhibit "J,"** SMITH334-335; 381-383), which Judge Cahill acknowledged receiving in "Interim Arbitration Award #2 re: Damages." **Exh. "B,"** at SMITH0038. <u>See</u>, e.g., *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 672 (4th Cir. 2015) ["Every federal circuit court to have addressed the issue has concluded that the False Claims Act 'affords noneconomic compensatory damages.'"]; and that a "**plaintiff cannot be made whole without being compensated for damages for reputational injury that diminished plaintiff's future earning capacity**." *Hanna v. WCI Communities, Inc.,* 348 F. Supp. 2d 1332, 1334 (S.D. Fla. 2004) (Emphasis added.)

---

**[9]** A true copy of the email "blast" is at **Exhibit "U"** SMITH218.

**[10]** In a JAMS "Supplemental Arbitration Disclosure," Judge Cahill answered "NO" to the query, "Is a party, a lawyer in the arbitration <u>or law firm with which a lawyer in the arbitration is</u> <u>currently associated a member of the provider organization</u>?"**Exh. "R,"** SMITH0653.

1    The Ninth Circuit has interpreted 9 USC § 10(a)(4), when an arbitrator exceeds his powers,

2    to encompass situations where an arbitrator's decision is "completely irrational" or exhibits a

3    "manifest disregard of law." *Kyocera Corp. v. Prudential–Bache Trade Servs.,* 341 F.3d 987, 997

4    (9th Cir.2003) (en banc) (citations omitted).  Judge Cahill was undeniably aware of the JAMS

5    rules and those he himself had set down in the Scheduling Order that was issued under those

6    JAMS rules. Smith submitted declarations and exhibits that the arbitration rules had said were

7    deemed admitted as evidence, but then Judge Cahill unexpectedly---and after the hearing had

8    begun---announced that he was following other, different rules. However, *as must be the case*

9    *here*, the "agreement to arbitrate often determines the procedural rules that the arbitrator applies in

10   resolving the underlying dispute. If the arbitrator ignores the plainly stated procedural rules

11   incorporated in the agreement to arbitrate while arriving at the arbitral award, that award is subject

12   to a manifest disregard of the law challenge." *Kashner Davidson Sec. Corp. v. Mscisz*, 531 F.3d

13   68, 77 (1st Cir. 2008) (Emphasis added.)[11]

14        Judge Cahill was made aware of the law regarding "reputational damages," which had

15   been expressly sought in the TAC and the Arbitration Complaint (SMITH0002), but despite

16   undenied evidence of how, when and by whom those injuries had been inflicted, he willfully

17   ignored his mandatory duty to award those compensatory damages. Absence of express reasoning

18   in the award may not be conclusive proof that the arbitrator disregarded the law, but Smith

19   submits that the lack of an explanation for omitting a component of damages *required to make him*

20   *whole*, **"may reinforce the reviewing court's confidence that the arbitrator[] engaged in**

21   **manifest disregard.**" *Halligan v. Piper Jaffray, Inc*., 148 F.3d 197, 204 (2d Cir.1998).

22        The FCA retaliation statute also includes a provision for attorney fees, but, in contrast to

23   other anti-retaliation statutes, classifies said "reasonable attorney fees" as components of

24   mandatory "special damages." Unfettered by Ninth Circuit constraints imposed on Article III

25   judges to clearly explain any reduction exceeding 10% of the lodestar fees (e.g., *Moreno v. City of*

26   *Sacramento*, 534 F.3d 106, 1112 (9th Cir. 2008)), Judge Cahill, after adjusting downward the

27   amount Smith requested to what the arbitrator calculated was the appropriate lodestar, then

28   *arbitrarily* reduced that amount by 55% (**Exh. "B,"** SMITH0010), notwithstanding the fact that

---

[11] **See**, also, JAMS Rule 1: "..(b) The Parties shall be deemed to have made these Rules a part of
their Arbitration agreement ("Agreement")"**Exh. "F,"** SMITH218

Smith's entitlement to said fees also arises under the same "make whole" rubric of Section 3730(h), which provides that relief "shall include" reinstatement, back pay, and "compensation for any special damages sustained as a result of the discrimination, **including** litigation costs and reasonable attorneys' fees." *Id.* §3730(h)(2)**. [12]**

   While the Supreme Court has confirmed that "statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA...," it has also repeatedly made clear that "**[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.**"   *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S. Ct. 1647, 1652, 114 L. Ed. 2d 26 (U.S. 1991).

   The law requiring that Smith be "made whole" was ignored by Judge Cahill, such that the resulting "award" is contrary to the public policy, also within the meaning of 9 U.S.C. § 10(a)(4), since Congress amended the FCA to include the retaliation provisions of Section 3730(h) because it wanted "to make employees feel more secure in reporting fraud to the United States and in commencing *qui tam* litigation, the better to reduce the amount of fraud in federal procurement." *Neal v. Honeywell Inc.,* 33 F.3d 860, 863 (7th Cir. 1994) abrogated by *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,* 545 U.S. 409, 125 S. Ct. 2444 (2005).

   Thus, "the overarching purpose of the statute is clear: to provide an aggrieved plaintiff with **complete compensation** for any injuries incurred as a result of the employer's retaliatory conduct, namely 'all relief necessary to make the employee whole.'" *Hammond v. Northland Counseling Center, Inc.,* 218 F.3d 886, 892 (8th Cir. 2000) (Emphasis added). By ignoring, or refusing the statutory duty to award **all** relief necessary to make that [plaintiff] whole," Judge Cahill's award is contrary to public policy in that it orders VMware to pay less than what is required by the statute and the public policy behind it.[13]

---

[12] **T**he Ninth Circuit confirms the lodestar is, *itself*, the presumptively "reasonable" amount of fees. *Morales v. City of San Rafael*, 96 F.3d 359, 364, fn. 8. (9th Cir. 1996).

[13] **"All means all."** See, *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 266–67 (5th Cir. 2014) for the proposition that "make whole" compensatory relief includes that for "reputational harm and damages for such." *Id*. Underlining added.

1

## II.    Discussion.

2

**A.  The arbitration was rendered fundamentally unfair, within the meaning of 9 U.S.C. 10(a)(3), by Judge Cahill's refusal to admit and consider pertinent and material evidence after assuring Smith that he would.**

3

4

Smith was denied an "adequate opportunity to present [his] evidence and argument."

5

*Hoteles Condado Beach v. Union De Tronquistas Local 901,* supra, 763 F.2d 34, 39; <u>accord</u>,

6

*Sunshine Min. Co. v. United Steelworkers of Am., AFL-CIO, CLC,* 823 F.2d 1289, 1295 (9th Cir.

7

1987).  The Arbitration Agreement between Smith and VMware provides, in part, that the subject

8

dispute "shall be settled by arbitration to be held in Santa Clara County, California, in accordance with the rules then in effect of the American Arbitration Association**." Dkt. # 76-2**.

9

The Scheduling Order issued on May 9, 2016 provides, in part, at ¶6, that, "The parties

10

have stipulated that JAMS Employment Arbitration Rules and Procedures apply here." **Exhibit**

11

**"I,"**; <u>see</u>, also, SMITH322, noting parties' stipulation to arbitration under "applicable JAMS

12

Arbitration Rules and Procedures."

13

JAMS Rule 2, subd. (b), provides, "When an Arbitration Agreement provides that the

14

Arbitration will be non-administered or administered by an entity other than JAMS and/or

15

conducted in accordance with rules other than JAMS Rules, the Parties may subsequently agree to

16

modify that Agreement to provide that the Arbitration will be administered by JAMS and/or

17

conducted in accordance with JAMS Rules." (**Exh. "F,"** SMITH219**).**

18

JAMS Rule 22, subd. (d), provides, in part, "The Arbitrator may limit testimony to

19

exclude evidence that would be immaterial or unduly repetitive, <u>provided that all Parties are</u>

20

<u>afforded the opportunity to present material and relevant evidence</u>." (**Exh. "F,"** SMITH232)

21

JAMS Rule 22, subd. (e), provides, "The Arbitrator shall receive and consider relevant

22

deposition testimony recorded by transcript or videotape, provided that the other Parties <u>have had</u>

23

<u>the opportunity to attend and cross-examine. The Arbitrator may in his or her discretion consider</u>

24

<u>witness affidavits or other recorded testimony</u> **even if the other Parties have not had the**

25

**opportunity to cross-examine**, but will give that evidence only such weight as he or she deems

appropriate." (**Exh. "F,"** SMITH233) Emphasis added.

26

Paragraph 7(i) of the Scheduling Order provides that, "Counsel shall identify all non-

27

rebuttal percipient and expert witnesses expect to testify at the Hearing **and indicate the manner**

28

**in which each witness is expected to testify (in-person, telephonically or by affidavit or**

**declaration**), not later than December 23, 2016, and may supplementally designate witnesses by 5 p.m. January 3, 2017. Witnesses not so identified shall not be permitted to testify at the hearing without a showing of good cause." (**Exh. "I,"** SMITH324) Emphasis added.

Paragraph 8(c) of the Scheduling Order provides that, "The parties shall indicate any objection to the introduction of any exhibit. **Exhibits not objected to shall be deemed admitted _at the commencement of the hearing_ unless otherwise ordered by the arbitrator**." (**Exh. "I,"** SMITH324) Emphasis added.

Smith submitted to the Arbitrator, and served on Respondent VMware, an Arbitration Binder containing his Arbitration Brief, Declarations and Motions, in compliance with Paragraph 8(b) of the Scheduling Order. The Arbitration Brief is at **Exhibit "C"**; the Scheduling Order is at **Exhibit "I."** The parties submitted a "Joint Exhibit List" that included notations as to whether either party objected to its admission. (**Exhibit "K."**)

Smith's Declaration set forth his testimony, with citations to supporting exhibits, in more-or-less chronological order. Smith testified about his reporting to VMware management, and efforts to stop, violations of the <u>False Claims Act</u> ("FCA"), violations of the <u>Sarbanes-Oxley Act</u> ("SOX"), and the retaliation he experienced as a result. (**Exh. "D,"** SMITH194)

That Declaration, submitted <u>prior</u> to the hearing with the Arbitration Brief, also contained Smith's testimony, beginning at ¶ 122, regarding his interactions with Patricia Gillette, a partner in the Orrick law firm, who was representing VMware in another employment-based lawsuit in August, 2009. (**Exh. "D,"** SMITH195)

When the Hearing was to begin on January 17, 2017, Claimant's counsel, Niall McCarthy, and the Arbitrator went off the record to discuss "some scheduling issues." 1 Tr. 233:21.[14]   The Arbitrator then asked VMware's counsel, Ms. Hermle, what she thought of admitting Smith's aforesaid declaration, to which counsel replied, "I think it's completely crazy to put in declaration when your client's the claimant and he's here to testify. I've never seen it permitted, but it sounds to me like you're going to permit it." 1 Tr. 233:23 – 234:2.

The Arbitrator allowed as how, "<u>I've done it a lot when people stipulate to it</u>." Ms. Hermle

---

[14] "Tr" refers to the Reporter's Transcript of the Hearing; true copies of the 5 volumes of reporter's transcripts of the 5-day hearing are concurrently lodged with the Court.

replied, "I'm definitely not doing that." 1 Tr. 234:3 – 5. The Arbitrator then said, "<u>So we're going to read the testimony</u>? It happens a lot when people bring in their direct. <u>It's only because people are trying to cut down the time</u>."  1 Tr. 234:6. Smith's counsel Jeffrey F. Ryan then said, "I'm prepared to ask him all the questions." The Arbitrator replied, "<u>Let's do it that way.</u>" 1 Tr. 234:13-14. Emphasis added.

Smith's counsel responded to the Arbitrator's query about the lack of a stipulation between the parties: "**<u>What you told us to do in the scheduling order is to let the other side know how we are going to do it, if it's going to be depo excerpts, declaration, affidavit or live testimony. We did that.</u>** We let them know we would be submitting a declaration for Mr. Smith as well as live testimony. ¶ We put them on notice. **<u>This is the first time I heard they are objecting</u>**." 1 Tr. 234:18; and see Smith's Witness List, submitted on December 23, 2016, and specifying that Smith would testify "via declaration <u>and</u> live testimony. [Smith] will cover all the issues in the case and we expect him to be on the stand on direct for 7 hours." (**Exhibit "L."**)

The Arbitrator observed, "<u>I was surprised there was not a stipulation</u>. But what are you going to do? Let's see how this goes. Okay?" 1 Tr. 235:1    VMware employee and witness, Parag Patel, *testified out of order*, and fully, on Day 1 (1/17/2017) of the Hearing. 1 Tr. 137. VMware consultant and former employee, Carl Eschenbach, testified fully on Day 2 (1/18/2017) of the Hearing. 2 Tr. 307. Eschenbach was Smith's direct supervisor at VMware from the day Smith started until he was fired.

On Day 3 (1/19/2017) of the Hearing, the testimony for the day ended at 5:00 p.m. with Judge Cahill asking Smith's counsel, "How much do you got to go? <u>I would like to start with Ms. Hermle in the morning</u>." Counsel replied, "I've got more, Your Honor." Counsel estimated he needed at least one more hour, which Ms. Hermle indicated, "I'll read that as three." Judge Cahill ordered, "I'll give you one more hour in the morning." 3 Tr. 883-884.[15]

On Day 4 (1/20/2017) of the Hearing, Smith's counsel had one hour to elicit testimony about the balance of 2009, including Smith's "protected activities," VMware's retaliatory actions, the facts leading up to the January 14, 2010 termination, and Smith's subsequent efforts to obtain

---

[15] Smith's counsel actually believed he needed 3 to 4 more hours, but said "one more hour" for fear he would get no more time at all. **See,** <u>Declaration of Ryan ISO Vacatur</u>.

employment, the reputational damages he gleaned during his job search, as well as identify the supporting exhibits. 4 Tr. 891 – 939. In other words, everything testified to in 15 pages of his Declaration, <u>and</u> the *belatedly-required* foundational identification of the exhibits cited therein. The sense of urgency was evident even from the dry pages of the Reporter's Transcript, e.g.:

| | |
|---|---|
| MR. RYAN: | All right. Let's go back to the Diane Greene meeting in February 20, 2008… |
| JUDGE CAHILL: | 20 minutes left. |
| MR. RYAN: | I know… |

**4 Tr. 918**.

| | |
|---|---|
| MR. RYAN: | Exhibit 414, Your Honor. |
| JUDGE CAHILL: | 414, okay. |
| MR. RYAN: | We want to move that into evidence. |
| JUDGE CAHILL: | All right. Probably (sic) is if you talked about it. Good. |
| MS. HERMLE: | Can I have one minute, please. Do you have that Exhibit 414? |
| MS. SEEKAO: | Which one? |
| JUDGE CAHILL: | **414**. It's in the same book. |
| MR. RYAN: | Can we have an agreement that she can move to strike because I'm running out of time? |
| JUDGE CAHILL: | Keep going. |
| MS. HERMLE: | I'll give you a minute while I look. |
| JUDGE CAHILL: | You've got an extra minute. |
| MS. HERMLE: | Okay, 15 seconds. I'm done. |

**4 Tr. 928**.

The Court will perceive that Exhibit #**414** on the Joint Exhibit List (**Exh. "K"**) lacks any indication in the appropriate column that VMware objected to its admission, so under the rules incorporated into the agreement to arbitrate, it was already deemed admitted *at the commencement of the hearing*. Moreover, the <u>time-consuming</u> objections interposed prodigiously by Ms. Hermle were neither proper, nor contemplated by the parties, under those original rules.

| | |
|---|---|
| MR. RYAN: | Take a look at 467---never mind. Forget it.  We don't have enough time. 516? |

1   MS. HERMLE:          Sorry. What was the last one you just said?

2   MR. RYAN:            467.

3   MS. HERMLE:          And that was the "never mind." What was the last one you just said?

4   **Tr. 931.**

5   The Interim Arbitration Award includes this: "In the year leading up to Smith's [January

6   14, 2010] termination, there is little evidence of Smith continuing to engage in protected activity."

7   (**Exh. "B**," SMITH031) And, at SMITH033, "While Smith has a long history of disagreeing with

8   and challenging VMware's federal pricing practices, the record does not support a finding that this

9   protected activity was a substantial motivating factor for his termination."[16]

10  The Interim Award also included the finding that, "Smith has failed to establish that

11  VMware's alleged SOX violations or Smith's alleged complaints about those violations were a

12  motivating factor in VMware's decision to terminate his employment. There was very little

13  testimony or evidence related to alleged SOX violations, and the testimony that did happen, did

14  not link any alleged complaints about SOX violations to Smith's termination." (SMITH33).

15  The evidence *not considered*, includes Smith's detailed account of when, what and how he

16  made further reports of VMware illegal pricing activities in the second half of 2009 and the first

17  14 days of 2010; his two detailed and discrete reports, and follow-up contacts with VMware's

18  Audit Committee, regarding SOX violations, the almost immediate retaliation he experienced after

19  each report, and the otherwise laughable subterfuge VMware ineptly executed to transfer him

20  shortly after the first SOX report into a mythical division of the company that was, 20 days later,

21  eliminated in a reorganization. (**Exhibit "D,"** SMITH189, *et seq*.)

22  In the *Harvey Aluminum* case, the court recognized that the "rules of evidence as applied in

23  court proceedings do not prevail in arbitration hearings…" 263 F. Supp. 488, 490. However, the

24  court noted the fundamental requirement of a "fair hearing," and defined the pertinent inquiry:

> To repeat, the issue before the court in the instant case is did the Arbitrator
> consider all the pertinent and relevant evidence offered in arriving at his
> Award and was the hearing from an over-all concept fair to both parties, not

---

[16] <u>See</u>, *Coszalter v. City of Salem*, 320 F.3d 968, 977- 978 (9th Cir. 2003) ["Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation…[f]or a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation."]

1        whether the testimony of Officer Gottesman was or was not proper rebuttal,

2 or whether the respondent did or did not throw a stone. *Ficek v. Southern Pac. Co.*, 338 F.2d 655, 657 (9 C.A.).

3 *Harvey Aluminum,* supra, 263 F. Supp. 488, 493–94; emphasis added. **<u>See</u>**, also, JAMS Rule 22(d)

4 ["The Arbitrator may limit testimony to exclude evidence *that would be immaterial or unduly repetitive*, **provided that all Parties are afforded the opportunity to present material and**

5 **relevant evidence**."] **Exh. "F,"** SMITH232

6        Based on the arbitration agreement, JAMS Rule 22(e) (SMITH233) and Scheduling Order,

7 ¶7(i) (SMITH324) the Arbitrator should have admitted Smith's Declaration into evidence*, since he*

8 *was present and available for cross-examination by VMware and there had been no earlier*

9 *objection to it.* For reasons obvious when the Declaration (**Exh. "D."**) is read, VMware's counsel

10 did not want that evidence to be considered by the Arbitrator, and she got her wish.

11        However, "…the refusal to hear or consider the testimony of [Smith by Declaration] be

12 assumed correct as not being proper…under the rules of evidence, since such rules are not to apply

13 [in Arbitration], the refusal to hear and consider the pertinent and material evidence also <u>reflects</u>

14 <u>an unfair hearing in violation of Title 9, United States Code, § 10(c).</u>" *Harvey Aluminum*, supra,

15 263 F. Supp. 488, 493. Underlining added. Because the time allocated for the Arbitration was

16 being consumed by having to walk Smith through the facts contained in his Declaration, and

17 identify the applicable exhibits, and respond to Ms. Hermle's copious objections---after VMware,

18 *the respondent/defendant*, had fully presented *its* case in chief—the evidence bearing on most of

19 the 2009 "protected activity," e.g., with respect to SOX violations, and VMware's retaliatory

20 response thereto, never saw the light of day.[17]

21        The Joint Exhibit List submitted in advance of the hearing (**Exh. "K"**) includes Exhibit

22 numbers 383, 385, 390, 391, 392, 395-396, 399, 421, 434 – 439, 442, 443, 449 and 456 (gathered

23 at **Exhibit "M"**), <u>none of which were objected to</u>, as the absence of annotations to the Joint List

24

25 [17] Indeed, in her argument, VMware's counsel stated that, "Mr. Smith does have two claims. No

26 evidence whatsoever, as I'll come back to, was submitted to you regarding the public policy wrongful termination claim which was premised on SOX complaints which were, A, not put in

27 evidence, B, not discussed by witnesses and, C, nowhere -- I have a whole section this, Your Honor, that I can take you through.  And you'll see that there could not possibly be liability on it."

28 **5 Tr. 1389 – 1390**.

1   (**Exh. "K."**) indicates. Yet NONE of them were "admitted" by Judge Cahill, despite ¶ 8(c) of the

2   Scheduling Order (**Exh. "I,"** SMITH324)**.** The exhibits "admitted" are listed at **Exhibit "V."**

3          Judge Cahill could have been informed by, e.g., **Exh. "D,"** SMITH137, ¶ 16, line 19,

4   wherein Smith recounts his interactions with Eschenbach in late 2005, before the bloom was off

5   their relationship: "Carl instructed them and HR to 'RIF' this employee, and Carl committed to

6   HR[18]  that he would not let the position be refilled for at least 6 months in order to meet the

7   minimum California standard for RIFs. **He told me that this was his favorite method of getting**

8   **rid of someone he did not like without it appearing he was targeting the employee."[19]**

9          Arbitrators "must give each of the parties to the dispute an adequate opportunity to present

10  its evidence and argument," *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997)

11  (quotation marks and citation omitted). Emphasis added. The *Iran Aircraft* case cited earlier is

12  instructive on the precise issue presented here:

13              At the pre-hearing conference, Judge Mangard specifically advised Avco not
                to burden the Tribunal by submitting "kilos and kilos of invoices." Instead,
14              Judge Mangard approved the method of proof proposed by Avco, namely the
                submission of Avco's audited accounts receivable ledgers. Later, when Judge
15              Ansari questioned Avco's method of proof, he never responded to Avco's
                explanation that it was proceeding according to an earlier understanding.
16              Thus, Avco was not made aware that the Tribunal now required the actual
                invoices to substantiate Avco's claim. Having thus led Avco to believe it had
17

18  _____

19  [18] The VMware HR executive who presided over Smith's actual firing *ceremony*, Sara Fogarty,
     was deposed and a joint submission of excerpts from the reporter's transcript of that proceeding
20  was submitted to Judge Cahill, including the witness' startling admission that Parag Patel was
     never Dane Smith's supervisor (Depo. Tr. 41:25-42:6 designated in VMware counsel Shannon
21  Seekao's email to Arbitrator 1/24/2017 **Exhibit "N;"** also 5 Tr. 1375.), and that NO OTHER
     VICE PRESIDENT HAD EVER BEEN RIF'ED (**Exhibit "N,"** Fogarty Depo. Tr, 37:12-23.),
22  which was confirmed by the Declaration of Tammy Shin, p. 5, ¶10 (**Exh. "O"**), which also went
     unconsidered, although *timely* submitted with the Arbitration Brief. VMware contended that Patel,
23  not Eschenbach, had made the decision to RIF Smith.

24  [19] Consider that evidence with Parag Patel's startling admission that, contrary to proffered defense
     of a *bona fide* transfer of Smith to Patel's "Alliances" department, then Smith's RIF less than 30
25  days later when that department was eliminated: Q: "At what point in time did Mr. Smith stop
     reporting to Mr. Eschenbach?" A: **"I guess he didn't."** (1 Tr. 187 – 188.) Smith never reported to
26  Parag Patel. **See** *Townsend v. Bayer Corp.,* 774 F.3d 446, 457 (8th Cir. 2014), reh'g denied (Jan.
27  27, 2015) ["**When an employee presents evidence showing an employer's stated reason for
     taking an adverse action against him is pretextual, such evidence also serves to prove
28  retaliation."**]

1     used a proper method to substantiate its claim, the Tribunal then rejected
      Avco's claim for lack of proof.
2
      We believe that by so misleading Avco, however unwittingly, the Tribunal
3     denied Avco the opportunity to present its claim in a meaningful manner.
      Accordingly, Avco was "unable to present [its] case" within the meaning of
4     Article V(1)(b), and enforcement of the Award was properly denied.

5     *Iran Aircraft Indus. v. Avco Corp.,* supra, 980 F.2d 141, 146.

6         The record supports Smith's assertion that the arbitrator's actions denied Smith a

7     fundamentally fair hearing within the meaning of 9 U.S.C. §10(a)(3), <u>and</u> were in manifest

8     disregard of the law, within the meaning of 9 U.S.C. §10(a)(4), by ignoring the procedural rules

9     incorporated into the arbitration agreement in favor of different, belatedly-announced rules.

10    **B.  The award must be vacated because Judge Cahill was willfully inattentive to
      31 U.S.C. § 3730(h), and the payment by VMware of what was ordered offends the public
11    policy underlying that statute.**

12        Judge Cahill ignored the procedural rules that were part of the arbitration agreement, and

13    he ignored the settled authority mandating that he order **all** relief necessary to make Smith whole

14    on account of VMware's retaliation. The Ninth Circuit has said that, "We have stated that for an

15    arbitrator's award to be in manifest disregard of the law, '[i]t must be clear from the record that the

16    arbitrator [ ] recognized the applicable law and then ignored it.' *Mich. Mut. Ins. Co. v. Unigard*

17    *Sec. Ins. Co.,* 44 F.3d 826, 832 (9th Cir.1995)."  *Comedy Club, Inc. v. Improv W. Assocs.*, 553

18    F.3d 1277, 1290 (9th Cir. 2009).

19        The *Mscisz* Court, noting that when asked why the Arbitration Panel had dismissed, with

20    prejudice, the Mscisz claims the Panel cited to NASD Rule 10305, held that the Panel "had not

21    previously imposed lesser sanctions on the appellant and therefore had not demonstrated that

22    sanctions short of a dismissal were ineffective." *Id.*, at p. 76. Smith submits that *Mscisz* is clearly

23    analogous, even on-point if, instead of NASD Rule 10305, the Court inserts the aforementioned

24    AAA-to-JAMS Rules-and- Scheduling-Order provisions, *viz*:

25    Thus, the [JAMS] rules became part and parcel of the arbitration contract,
      serving as the procedural rules governing the arbitration proceeding. *See* 11
26    Richard A. Lord, *Williston on Contracts* § 30:25 (4th ed. 2008)… If the Panel
      disregarded those rules, it necessarily disregarded the arbitration contract as
27    well. *See George Watts & Son, Inc. v. Tiffany and Co.,* 248 F.3d 577 (7th
      Cir.2001) (hypothesizing that if an arbitration agreement specifies that a
28    dispute is to be resolved under Wisconsin law, and the arbitrator states that

she prefers New York law, or no law at all, <u>that the award could be deemed a "manifest disregard of the law" or, alternatively, as exceeding the arbitrator's powers</u>).[7] Thus, if "the [Panel] disregarded the plain and unambiguous language of the governing arbitration agreement ...., [it] **acted in manifest disregard of the law and failed to draw [its] award from the essence of the agreement**…"

*Kashner Davidson Sec. Corp. v. Mscisz,* supra, 531 F.3d 68, 77–78; emphasis added.

### a. Ignoring the Procedural Rules.

As noted, Judge Cahill ignored the JAMS Rules (**Exh. "F"**) and the Scheduling Order procedure (**Exh. "I"**) that "become part and parcel of the arbitration contract," thereby denying Smith the opportunity to present his evidence. VMware's counsel cajoled Judge Cahill, after her opening statement, to simply, but radically, change the rules:

> MS. HERMLE: …[W]e ask that despite the relaxed Rules of Evidence which you and other arbitrators often apply in arbitration, that you keep an eye out for the lack of foundation in the parade of disgruntled employees' testimony linking what they knew and what they're going to say with what's actually at issue before you.
>
> JUDGE CAHILL: I think I've told people, maybe I haven't told you guys, that the more you're close to the Evidence Code requirements, the more reliable it is for me.
> And if you ever hear me say it goes to the weight, it's code for I'm never going to look at it again.

**1 Tr. 105:16 – 106:4**.

The effect of Judge Cahill's wholly unexpected rule change was to slow down the presentation of Smith's case, making it impossible for him to <u>fairly</u> present the testimonial and demonstrative evidence he, and his counsel, had been assured was, in large part, *already admitted*.

### b. Reputational Damages.

In his Arbitration Complaint, Smith repeated the prayer set forth in the TAC filed in the Eastern District of Virginia:

> Mr. Smith seeks all relief necessary to make him whole pursuant to 31 U.S.C. § 3730(h), including reinstatement, lost earnings, commissions, merit increases, benefits, back-pay, interest, losses on stock options, <u>damage to reputation</u> and other consequential damages, compensation for any special

damages, double damages, and attorney fees and costs as allowed by law…
**Dkt. #39, p. 59 of 62;** emphasis added**; Exh. "A,"** SMITH0002, ¶ 9.

Smith testified that his superior, Carl Eschenbach, had called Smith to his office, informed Smith that his pay was being cut; that others in the VMware organization were asking Eschenbach why Smith would want to remain with the company after his first demotion; that Eschenbach had discussed Smith with Rob Salmon, Eschenbach's opposite number at Network Appliances, who revealed that George Bennet was being fired from Network Appliances for poor performance, whereupon Eschenbach shared that the same fate was befalling Smith---he was being removed from his position. **3 Tr. 841 – 842**. In Smith's *unadmitted* testimony-by-declaration, Smith recounted Eschenbach's confirmation that "…he was putting out the word that I was flawed, just like he had done [with another employee]." **Exh. "D,"** at SMITH183.

Smith's unadmitted/not considered Declaration also shows his manful attempts to find employment following his March, 2010 termination by VMware, and how those efforts would produce initially positive results, only to be end in silence from prospective employers (and head-hunters) after they indicated they were going to contact Carl Eschenbach. (**Exh. "D,"** SMITH205-208) The inference of being *blackballed* is also supported by the Declaration of Tammy Shin (**Exhibit "O")**, and by the deposition testimony, which was admitted, of VMware's HR executive Sara Fogarty. (**Exh. "N."**) Further, Smith's counsel reported the black-balling to the redoubtable Ms. Gillette in an August, 2010 email, which she acknowledged receiving. (**Exhibit "Q."**)

In the briefs submitted to Judge Cahill, Smith cited the facts and the law militating for an award of <u>damages</u> for injuries to his <u>reputation</u>, and Judge Cahill even cited one of Smith's authority, e.g., (**Exhibit "B,"** SMITH040), but completely ignored that component of damages.

**c.   Attorney Fees.**

Judge Cahill found that the correct (after adjustments for duplicative billing brought to his attention by Smith's counsel) lodestar amount was $2,278,233. He then said:

> The arbitrator <u>finds that the outcome of the arbitration was significant and vindicated Smith, although the "degree of success" was significantly less than sought.</u> See *Bravo*, 800 F.3d 666. While VMware urges the arbitrator to reduce the fees sought by 90% based on Smith's limited success, the arbitrator finds that under *Hensley* and the other cases relying on *Hensley*, the results obtained in this arbitration <u>compel</u> a reduction of 55 percent of the

1    lodestar amount.

2    (**Exh. "B,"** at SMITH051 – 054, fn. 4.)[20]

3        The arbitrability of federal statutory claims like Smith's "rests on the assumption that the

4    arbitration clause permits relief equivalent to court remedies." *Paladino v. Avnet Computer Techs.,*

5    *Inc.,* 134 F.3d 1054, 1062 (11th Cir.1998). Although an arbitration agreement "does not violate a

6    plaintiff's rights merely because it precludes a limited number of remedies," *Price v. Taylor,* 575

7    F.Supp.2d 845, 854 (N.D. Ohio 2008), such provisions are not enforceable if they "undermine[ ]

8    the rights protected by the statute," which they accomplish by restricting access to the "full

9    panoply of remedies" available under the statute. *Morrison,* 317 F.3d at 669. [21]

10       Judge Cahill was repeatedly reminded of, but willfully ignored the pertinent law with

11   respect to the "make whole" provisions of the FCA. Smith apprised Judge Cahill of the scope of

12   the "make whole," and "special damages" language set forth in 31 U.S.C. 3730(h), which the

13   arbitrator quoted, with emphasis, at SMITH048, Interim Award #3 (**Exh. "B**."). Smith is not

14   claiming that Judge Cahill erred in the interpretation or application of the law with respect to the

15   reduction of the lodestar fee amount, but rather that he ignored the mandatory duty to make Smith

16   whole, as required by the FCA.

17       In a seminal FCA case cited by Smith (and Judge Cahill), a district court reasoned that:

18           …the language of the section refers to "compensation for any special
             damages sustained as a result of the discrimination, including litigation costs
19           and reasonable attorneys' fees. This phrase could mean the plaintiff's
             compensation includes reasonable attorneys' fees. In other words, the
20           "including attorneys' fees" phrase can be thought to modify the word
             "compensation" just as easily as the words "special damages" without doing
21           violence to the English language. …

22           … Reasonable attorneys' fees are part of [Smith's] compensation as a
             successful plaintiff in an employment discrimination case whether clad in the

23   _____

24   [20] Although it is comparatively *de minimis*, Smith notes that the arbitrator deducted the $170,785
     in duplicate billing reported by Smith's counsel (**Exh. "B**," at SMITH048, fn. 3) from the lodestar
25   amount, BUT then deducted the $8,520 that VMware claimed was duplicative from the adjusted
     lodestar amount after it was reduced by 55%. Accidental, or intentional, it was error. The fee
26   awarded should have been **$1,021,370.85** instead of $1,016,684.85.

27   [21] Cf. *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 953 (7th Cir. 1998) ["When **reputational injury**
     caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity,
28   she cannot be made whole without compensation for the lost future earnings she would have
     received absent the employer's unlawful activity."]

sobriquet "special damages" or not.

*Neal v. Honeywell, Inc.,* 995 F. Supp. 889, 899 (N.D. Ill. 1998), aff'd, 191 F.3d 827 (7th Cir. 1999); underlining added.

**C.  The award must be vacated on account of Judge Cahill's failure to disclose his relationship with Patricia Gillette.**

The facts demonstrating JAMS'/Judge Cahill's "evident partiality" under 9 U.S.C. § 10(a)(2) (construed, in non-disclosure cases, to mean a "reasonable impression of partiality") by failing to disclose Patricia Gillette's affiliation with him/JAMS are as follows:

**1.**      FCA jurisprudence establishes that an employee may give notice to the employer of employee's "protected activities" by, *inter alia*, reporting the company's illegal activities to his employer's legal counsel. *Neal v. Honeywell*, 33 F.3d 860, 863 (7th Cir. 1994).[22]

**2.**      Dane Smith reported at length to Patricia Gillette, an Orrick partner employed to defend VMware in the 2009 Wheeler case, that VMware was illegally overcharging the federal government for goods and services, engaging in conduct that was proscribed by the Sarbanes-Oxley Act, and other illegal and unseemly behavior, and that he (Smith) had been retaliated against because of his efforts to stop those activities. **Exh. "D,"** at SMITH194 - 198.

**3.**      When Smith attempted to truthfully answer questions pertaining to SOX violations that were posed by Wheeler's attorney during a deposition, Patricia Gillette took Smith aside and told him to be careful about what he said; that despite earlier demotions he still had a job with VMware that might be jeopardized by how he answered the deposition questions. His truthful answers in that August, 2009 deposition angered Patricia Gillette, who following Smith's firing by VMware sent emails to Smith's counsel demanding the return of Smith's laptop computer, and, when squarely presented with evidence of the damage being done to Smith's reputation by VMware's agent, claimed that she would "do some follow up work [and] I will get back to you." **("Exhibit "Q".**)

**4.**      When Smith and his counsel agreed to arbitration by JAMS instead of AAA, and further agreed to Judge Cahill as the neutral assigned to the case, they were provided with

---

[22] This Court has ruled that such confidential information and privileged communications may be disclosed by a whistleblower when it "is reasonably necessary to any claim or defense in the case." *Wadler v. Bio-Rad Labs., Inc.,* 212 F. Supp. 3d 829, 849 (N.D. Cal. 2016).

1  disclosure material, including JAMS Arbitration Administrative Policies, number III of which

2  provides, "The Parties have agreed or hereby agree that they will not call the arbitrator <u>or any</u>

3  <u>employee or agent of JAMS as a witness</u> or as an expert in any proceeding involving the Parties

4  and relating to the dispute which is the subject of the arbitration…" (**Exh. "R,"** SMITH**0638)**

5       **5.**     Had Smith and his counsel known, or become aware prior to the arbitration hearing

6  that Patricia Gillette would jump from being an Orrick partner and Smith's antagonist to being a

7  JAMS/Cahill partner, a move that would also preclude Smith from calling her as a witness to rebut

8  any VMware denial that **(a)** Smith was engaged in "protected activities" in 2009 and **(b)** VMware

9  had  notice of those activities by Smith's reporting the federal pricing and SOX illegalities to

10  VMware counsel (Ms. Gillette and Mr. Chung), they never would have agreed to JAMS/Cahill as

11  the arbitrator. <u>Declarations of Dane Smith & Jeffrey F. Ryan ISO Vacatur.</u>

12       **6.**     Although the deep involvement of Patricia Gillette in this case was known to Judge

13  Cahill as early as April 4, 2016, when VMware disclosed it in a brief (**Exhibit "S"**) and was more

14  fully revealed in Smith's Declaration (**Exh. "D**."), Judge Cahill never <u>directly</u> disclosed to Smith

15  that Ms. Gillette had become one of his JAMS partners at some point during the pre-hearing

16  arbitration process. <u>Declarations of Ryan and Smith ISO Vacatur.</u>

17       **7.**     Although JAMS served on the Orrick law firm and Smith's counsel a February 4,

18  2016 "Memorandum" covering a "Disclosure Checklist" and asking each participant to, "[p]lease

19  advise the arbitrator's Case Manager Jessica Nixon…if you know of any additional information

20  that should be in the disclosure report…" and "JAMS and the arbitrator will rely upon the parties'

21  disclosure to us of information which is inconsistent with or not included in the disclosure

22  provided.." (**Exh. "R,"** SMITH645)**,** not one word was uttered to Smith prior to the arbitration

23  hearing that Patricia Gillette had become Judge Cahill's JAMS partner, other than an email "blast"

24  in October, 2016 from JAMS. (<u>Declarations of Ryan and Smith ISO Vacatur.</u>)

25       **8.**     On that Checklist, Judge Cahill replied "No" to the following questions: #7

26  "Arbitrator …<u>has or has had any other professional relationship</u> with a party <u>or lawyer for party?</u>"

27  #11 "Arbitrator…has personal knowledge of disputed evidentiary facts relevant to the arbitration?

28  <u>A person likely to be a material to be a material witness in the proceeding is deemed to have</u>

<u>personal knowledge of disputed evidentiary facts</u>." #13 Is there any other matter that: (A) <u>Might</u>

cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial?" (**Exh. "R,"** SMITH648**).** Judge Cahill, at some point in the arbitration, came to have a "professional relationship" with Patricia Gillette, who was not only VMware's former attorney, but was VMware's former attorney in matters, including the precursor to the arbitration, that involved Smith, who had confided in her essentially all of his protected activities and the retaliation he had suffered at VMware. Ms. Gillette was also the former partner of current VMware attorney Lynne Hermle.

       **9.**     Following the "Checklist," Judge Cahill executed a "Declaration of Arbitrator" that said, in part, "3. I practice in association with JAMS. Each JAMS neutral, including me, has an economic interest in the overall financial success of JAMS. In addition, because of the nature and size of JAMS, the parties should assume that one or more of the other neutrals who practice with JAMS has participated in an arbitration, mediation or other dispute resolution proceeding with the parties, counsel or insurers in this case and may do so in the future." (**Exh. "R."** SMITH651**).**

       **10.**    At the time of Judge Cahill's selection and assignment as the arbitrator, he/JAMS disclosed that Judge Cahill's daily fee of $9,000,[23] and/or hourly rate of $800 (**Exh. "R,"** SMITH0639) would be paid by the Orrick firm's client, VMware, which was in keeping with Judge Henderson's excision of a provision in the arbitration agreement calling for the parties to split the arbitration costs. (**Dkt. # 83**.) It was also disclosed that during the course of the arbitration proceedings Judge Cahill would entertain and accept assignment offers "from a party, lawyer in arbitration, or lawyer or law firms that is currently associated in the private practice of law with a lawyer in the arbitration while that arbitration is pending, including offers to serve as a dispute resolution neutral in another case." (**Exhibit "R,"** SMITH649) Over the succeeding months, Judge Cahill provided Smith and his counsel with several notices that Judge Cahill had accepted assignment as a neutral in cases in which the Orrick firm and/or Ms. Hermle were involved (**Exh. "T"**), but Judge Cahill *never made any similar*, or direct disclosure of Patricia Gillette's impending, or actual employment by JAMS. Declarations of Jeffrey F. Ryan and Dane Smith ISO Vacatur.

---

[23] Interestingly, just 15 years ago, the average daily fee for arbitrators in this district was *only* $1,900. *Ting v. AT & T*, 182 F. Supp. 2d 902, 934 (N.D. Cal. 2002), aff'd in part, rev'd in part sub nom. *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003).

**11.**     After Judge Cahill issued the Final Award, but prior to Smith's revelation that he was moving to vacate it, he asked JAMS to provide him with a copy of the statement of services rendered by JAMS/Judge Cahill for the challenged arbitration proceedings. Inexplicably, <u>JAMS refused to disclose</u> just how much VMware paid for Judge Cahill's/ JAMS' services. **Exh. "W."** Smith does not even know how much <u>VMware paid to Judge Cahill and/or JAMS</u> for such a palpably flawed, one-sided arbitration award. <u>Declaration of Smith ISO Vacatur</u>.

That Judge Cahill had some knowledge, *prior to the arbitration hearing*, of Ms. Gillette's role is suggested by *his* answer to a question propounded of witness John Wheeler:

> MR. RYAN:          Who was representing VMware in that lawsuit?
>
> MR. WHEELER:     The lady was from Orrick, I believe.
>
> JUDGE CAHILL:   **Pat Gillette**.

**Tr. 234:14**.

These facts give rise to a "reasonable impression of partiality." *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (finding that an arbitrator who "knows of a material relationship with a party and fails to disclose it" demonstrates "evident partiality" under Second Circuit law, as <u>"[a] reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side"</u>).[24]

The burden was on Judge Cahill to disclose facts creating *a reasonable impression of partiality*, not on Smith to discover them. <u>**See**</u>, *In re Sussex*, 781 F.3d 1065, 1074 (9th Cir. 2015) ("[A]rbitrators must disclose facts showing they "might reasonably be thought biased against one litigant and favorable to another.") *cert. denied sub nom. Turnberry/ MGM Grand Towers, LLC, v. Sussex*, 136 S. Ct. 156 (2015).

A fairly recent California appellate court decision should guide this Court's reasoning because <u>the disclosure standards under California law are controlling here</u>:

> The parties to a medical malpractice arbitration agree upon a neutral arbitrator. <u>Subsequent to commencing arbitration proceedings but prior to the hearing, counsel for the defendant doctor affiliates with the firm providing</u>

---

[24] "…the legal standard for evident partiality is whether there are '"facts showing a '**reasonable impression of partiality**'."' *Id.* at 1048. *New Regency Prods., Inc. v. Nippon Herald Films, Inc.,* 501 F.3d 1101, 1106 (9th Cir. 2007), citing and quoting *Schmitz v. Zilveti,* 20 F.3d 1043 (9th Cir.1994).

the arbitrator. Neither counsel nor the arbitrator discloses that relationship. Here we conclude that the California Arbitration Act (the Act) (Code Civ. Proc., § 1280 et seq.),1 and the California Rules of Court, Ethics Standards for Neutral Arbitrators in Contractual Arbitrations (Ethics Standards) require that the arbitrator disclose the relationship. The Act and the Ethics Standards (1) require a neutral arbitrator to disclose that a lawyer in the arbitration is a member of the administering "dispute resolution provider organization" (DRPO); and (2) section 1286.2, subdivision (a)(6) compels a trial court to vacate the arbitration award if the arbitrator fails to disclose that information.

*Gray v. Chiu*, 212 Cal. App. 4th 1355, 1358 (2013) Emphasis added.

Judge Cahill was required, under California law, to disclose his JAMS "partnership" with her under the general duty to disclose "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial" California CCP § 1281.9(a); CRC Ethics Standards, Standard 7(d)(15)(A). Smith and his counsel faced a familiar conundrum:

> [O]nce the disclosure was made the harm was done regardless of the outcome. The disclosure put our clients in the awkward position of either objecting to or appearing to approve the representation by the neutral arbitrator's firm of a party adverse to our client in another arbitration. If we object, we run the risk of offending the neutral; if we don't object, we appear to condone a clear conflict. **We should never have been put in this position.**

*Thomas Kinkade Co. v. White*, supra, 711 F.3d 719, 724–25.

### III.   CONCLUSION

Smith was denied the fundamentally fair arbitration hearing to which he was entitled, and to which VMware was amply provided. Cf. *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 927 (9th Cir. 2013) ["Federal law favoring arbitration is not a license to tilt the arbitration process in favor of the party with more bargaining power."] For the reasons set forth herein, and pursuant to 9 U.S.C. §10, the award of the arbitrator should be vacated and the cause remanded for a new arbitration before a different arbitrator unaffiliated with JAMS.

Dated; October 13, 2017.

Respectfully submitted,

/s/

JEFFREY F. RYAN
Attorney for Plaintiff